**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

In re:                                        Chapter 11

THE DIOCESE OF ST. CLOUD, a Minnesota    Case No. 20-60337
religious corporation,

                    Debtor.

---

**FIRST AMENDED DISCLOSURE STATEMENT TO ACCOMPANY**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION**

---

## TABLE OF CONTENTS

I.      INTRODUCTION. .................................................................................................... 1

II.     INFORMATION ABOUT THE DISCLOSURE STATEMENT AND PLAN
        CONFIRMATION PROCESS. ................................................................................ 2

    A.    Definitions and Plan Supremacy. ......................................................................... 2

    B.    Limited Representations. ........................................................................................ 2

    C.    Voting Procedures. ................................................................................................. 3

III.    OVERVIEW OF PLAN. ........................................................................................... 5

IV.     THE DEBTOR. .......................................................................................................... 6

    A.    The History and Structure of the Diocese. .......................................................... 6

    B.    Mission and Ministry. ............................................................................................ 7

    C.    Funding Operations. .............................................................................................. 8

    D.    The Debtor's Assets. .............................................................................................. 8

        1.    Real Property. ................................................................................................. 9

        2.    Cash and Investments. ................................................................................. 10

        3.    Other Personal Property. ............................................................................. 10

        4.    Discussion of Avoidance Actions. ............................................................... 11

    E.    The Debtor's Liabilities. ....................................................................................... 11

        1.    Tort Claims. .................................................................................................. 11

        2.    Faricy Claim. ................................................................................................ 11

        3.    US Bank PPP Loan Claim. .......................................................................... 12

        4.    Catholic Charities Claim. ............................................................................ 12

        5.    Annuities. ...................................................................................................... 12

        6.    Employee Claims. ......................................................................................... 13

        7.    Trade Debt and Other Unsecured Claims. ................................................. 13

V.      SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE. ............. 13

    A.    The Sexual Abuse Crisis and the Diocese's Response. ....................................... 13

    B.    Tort Lawsuits. ....................................................................................................... 15

VI.     CHAPTER 11 FILINGS. ......................................................................................... 16

    A.    First Day Motions. ................................................................................................ 16

    B.    Schedules & Statements. ....................................................................................... 17

    C.    Proof of Claim Deadline and Notice. .................................................................. 17

    D.    Formation of Official Committee of Unsecured Creditors. ................................ 17

    E.    Broker Application. .............................................................................................. 17

**F.**    **Catholic Charities Settlement.** ........................................................................... 18

**G.**    **Executory Contracts.** ....................................................................................... 18

**VII.**    **ANTICIPATED CHAPTER 11 EVENTS.** ....................................................... 18

**A.**    **Potential Sales of Property.** ........................................................................... 18

**B.**    **Potential Post-Petition/Exit Financing.** ........................................................ 18

**C.**    **Plan Confirmation.** ......................................................................................... 19

**D.**    **Fee Applications.** ............................................................................................ 19

**VIII.**    **DESCRIPTION OF PLAN AND MEANS FOR EXECUTION.** ...................... 19

**A.**    **Claims Description and Treatment.** ................................................................ 19

**B.**    **Unclassified Claims.** ....................................................................................... 20

**C.**    **Classified Claims.** ........................................................................................... 21

    **1.**    **Class 1 – Priority Employee Unsecured Claims.** ................................. 21

    **2.**    **Class 2 – Prepetition Date Secured Tax Claims.** ................................. 21

    **3.**    **Class 3 – Unsecured Claim of Faricy.** ................................................. 22

    **4.**    **Class 4 – US Bank PPP Loan Claim.** .................................................. 22

    **5.**    **Class 5 – Catholic Charities Claim.** .................................................... 23

    **6.**    **Class 6 – General Unsecured Convenience Claims.** ............................ 23

    **7.**    **Class 7 – General Unsecured Claims.** .................................................. 23

    **8.**    **Class 8 – Other Tort and Employee Claims.** ....................................... 23

    **9.**    **Class 9 – Annuity Claims.** ................................................................... 24

    **10.**    **Class 10 – Tort Claims.** ....................................................................... 24

    **11.**    **Class 11 – Unknown Tort Claims.** ....................................................... 26

    **12.**    **Class 12 – Co-Defendant and Parish Claims.** ...................................... 29

    **13.**    **Class 13 – Insurance and Benefit Claims.** ........................................... 29

    **14.**    **Class 14 – Penalty Claims.** .................................................................. 29

**IX.**    **MEANS FOR PLAN IMPLEMENTATION.** .................................................. 30

**A.**    **Establishment of Trust Account.** .................................................................... 30

**B.**    **Establishment of Administrative Claims Reserve.** ......................................... 31

**C.**    **Unknown Tort Claims Obligation.** ................................................................. 31

**D.**    **Payment and Treatment of Claims Other Than Tort Claims and Unknown Tort Claims.** ........................................................................................................... 31

**E.**    **Retained Claims.** ............................................................................................. 32

**F.**    **Other Approvals.** ............................................................................................ 32

**G.**    **Settlements.** .................................................................................................... 32

**H.**    **Non-Monetary Commitment to Healing and Reconciliation.** ........................ 32

-ii-

| | | |
|---|---|---|
| **X.** | **CONDITIONS PRECEDENT TO EFFECTIVE DATE.** | 32 |
| A. | Conditions Precedent. | 32 |
| B. | Waiver of Conditions. | 33 |
| C. | Closing. | 33 |
| D. | Implications of Effective Date. | 33 |
| E. | Non-Occurrence of Effective Date. | 33 |
| **XI.** | **REORGANIZATION OF DEBTOR AND POST-CONFIRMATION MANAGEMENT.** | 34 |
| A. | Continuing Existence. | 34 |
| **XII.** | **POST-EFFECTIVE DATE EVENTS AND PERFORMANCE BY THE REORGANIZED DEBTOR.** | 34 |
| A. | Post-Effective Date Obligations. | 34 |
| B. | Post-Effective Date Funding. | 35 |
| C. | Dissolution of Committee. | 35 |
| D. | Final Decree. | 35 |
| E. | United States Trustee Obligations. | 35 |
| F. | Non-Tort Claims Review, Allowance, and Payment. | 36 |
| G. | Payments Effective Upon Tender. | 36 |
| H. | Preservation of Debtor's Claims, Demands, and Causes of Action. | 37 |
| I. | Unimpaired Claims. | 37 |
| J. | Operative Documents. | 37 |
| K. | Return of Deposits. | 38 |
| L. | Delivery of Distributions (Except to Holders of Tort Claims and Unknown Tort Claims). | 38 |
| M. | Transmittal of Distributions to Tort Claimants and Unknown Tort Claimants. | 38 |
| N. | Absence of Address or Returned Mail. | 38 |
| O. | Continuation of Current Insurance and Benefits Coverage. | 39 |
| **XIII.** | **THE TRUST AND LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT CLAIMS.** | 39 |
| A. | Claim Payments. | 39 |
| B. | No Execution. | 39 |
| C. | Special Provisions Relating to Tort Claims and Unknown Tort Claims. | 39 |
| D. | Termination. | 41 |
| E. | No Liability for Costs. | 41 |
| **XIV.** | **TREATMENT OF EXECUTORY CONTRACTS** | 41 |

QB\65418958.1

**XV.    EFFECT OF CONFIRMATION**...................................................................... 42

   **A.    Discharge**. .......................................................................................... 42

   **B.    Vesting**............................................................................................... 42

   **C.    Exculpation and Limitation of Liability**. ........................................... 42

   **D.    Limitation of Liability**. ...................................................................... 43

   **E.    Channeled Claims**. ............................................................................. 43

   **F.    Permanent Injunction Against Channeled Claims**. .............................. 43

   **G.    Channeling Injunction as Mutual Release**........................................... 44

   **H.    Injunctions Deemed Issued and Permanent**. ...................................... 44

   **I.    Retention of Jurisdiction**. .................................................................. 44

**XVI.    FEDERAL TAX CONSEQUENCES**. .................................................... 44

   **A.    The Trust**. .......................................................................................... 45

   **B.    Federal Income Tax Consequences to Holders of Claims**................... 46

**XVII.    MODIFICATION OF PLAN**................................................................ 47

**XVIII.    ACCEPTANCE AND CONFIRMATION**. ............................................. 48

   **A.    Voting Procedures**.............................................................................. 48

     **1.    Generally**................................................................................. 48

     **2.    Form of Ballots**........................................................................ 48

     **3.    Ballot Tabulation**. .................................................................... 49

     **4.    Submission of Ballots**............................................................... 50

   **B.    Feasibility**.......................................................................................... 50

   **C.    Best Interests of Creditors and Liquidation Analysis**. ........................ 50

   **D.    Confirmation over Dissenting Class**................................................... 51

     **1.    Dissenting Class**....................................................................... 51

     **2.    No Unfair Discrimination**......................................................... 51

     **3.    Fair and Equitable Test**............................................................ 52

   **E.    Risk Factors**....................................................................................... 53

   **F.    Effect of Non-Confirmation**. .............................................................. 53

**XIX.    ALTERNATIVES TO THE PLAN**. ...................................................... 53

   **A.    If The Plan Is Not Confirmed, Several Different Events Could Occur**... 53

**XX.    RECOMMENDATION OF THE PLAN PROPONENTS AND CONCLUSION**.... 54

QB\65418958.1

## I.      <u>INTRODUCTION.</u>

The Diocese of St. Cloud, a Minnesota religious corporation (the "**Debtor**"), the debtor-in-possession in the above-captioned Chapter 11 case (the "**Reorganization Case**"), together with the Official Committee of Unsecured Creditors (the "**Committee**" and, together with the Debtor, the "**Plan Proponents**"), have prepared this First Amended Disclosure Statement (the "**Disclosure Statement**") in connection with their joint solicitation of acceptances of the First Amended Joint Plan of Reorganization (the "**Plan**"), a copy of which is being served contemporaneously herewith. The purpose of the Disclosure Statement is to provide creditors with adequate information about the Plan.

Survivors of Abuse are a focal point of the Plan.  The tragedy of the Abuse that was inflicted in the past on various young people by certain priests or others purporting to do the missionary work of the Roman Catholic Church is impossible to overstate.  Instead of fulfilling this mission, such perpetrators inflicted harm and suffering on certain children and teenagers whom they encountered.  The Abuse is inexcusable.  It not only deeply impacted the survivors, but it also affected the faithful and the community that the Debtor serves.

Following the recent enactment of the Minnesota "Child Victims Act", several Abuse claimants filed lawsuits against the Debtor.  These lawsuits considerably impacted the Debtor's remaining insurance and benefits coverage and certain Assets.  Before the Debtor filed the Reorganization Case, it worked for several years to negotiate a framework for compensation acceptable to its insurance and benefits coverage providers and the known Abuse survivors.  All parties agreed that bankruptcy was the only viable means to preserve and fairly distribute the Debtor's limited resources among the numerous creditors who remain uncompensated.  To consummate the negotiated framework, the Plan Proponents jointly propose the Plan.  Through the efforts of the primary stakeholders, the sale or financing of certain of the Debtor's Assets, and the prepetition settlements with the Debtor's primary insurance and benefits coverage providers, the Debtor has assembled a cash fund that will be used to compensate survivors, pay the Debtor's other creditors, and perform the Debtor's obligations under the Plan.

Through the Plan, the Debtor will also restructure its financial affairs to continue its mission and ministry, which is critical to many—especially the elderly, poor, and incarcerated—in its community.  The Debtor will also continue its programs aimed to protect children and vulnerable adults, and the Debtor will endeavor to address the spiritual needs of those who were harmed and its community.

In this Disclosure Statement, the Plan Proponents provide adequate information for creditors to evaluate the Plan and decide whether to vote to accept it.  The Plan Proponents also provide information about the Plan voting and confirmation process.

In addition to summarizing the confirmation process and the Plan itself, the Disclosure Statement contains information about the Debtor and its history, Assets, liabilities, and business plans for future operations, as well as events that occurred prior to, and are expected to occur during, the Reorganization Case.  The Disclosure Statement also provides information regarding the Abuse perpetrated by individuals associated with the Debtor, and the steps taken by the Debtor

to address the injuries inflicted by those individuals and to prevent such Abuse from occurring both now and in the future.

## II.     INFORMATION ABOUT THE DISCLOSURE STATEMENT AND PLAN CONFIRMATION PROCESS.

### A.     Definitions and Plan Supremacy.

The capitalized terms used but not otherwise defined in this Disclosure Statement have the same definitions given to them in the Plan, unless it is expressly stated that a capitalized term will have a different meaning when used in this Disclosure Statement.  In addition, unless otherwise stated, terms used in this Disclosure Statement will have the same meanings as in the Bankruptcy Code, the Bankruptcy Rules, or the local rules of the Bankruptcy Court.  Terms defined in this Disclosure Statement that are also defined in the Plan or the other sources described above, are solely for convenience when reading this Disclosure Statement; the Debtor does not intend to change the definitions of those terms from the Plan or from the otherwise applicable sources. Furthermore, in the event of any inconsistency between the Plan and this Disclosure Statement, the Plan will control.  The exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### B.     Limited Representations.

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from holders of certain Claims.  This Disclosure Statement has been approved by the Bankruptcy Court as containing information of a kind, and in sufficient detail, that is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Plan.

In determining whether the Plan should be confirmed, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether it is feasible, and whether it is in the best interests of the holders of Claims.  The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by parties entitled to vote.  Only holders of Allowed Claims that are impaired under the Plan will be allowed to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  THE PLAN IS THE OPERATIVE DOCUMENT.  THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, A COPY OF WHICH IS BEING SERVED CONTEMPORANEOUSLY HEREWITH, SHOULD BE READ COMPLETELY.  FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.

Information contained in this Disclosure Statement was obtained from knowledgeable personnel at the Debtor or from the books and records of the Debtor.  Financial information developed for purposes of this Disclosure Statement was developed by the Debtor's personnel working in conjunction with the Debtor's Professionals.  Certain materials contained in this

Disclosure Statement are taken directly from other, readily accessible documents or are digests of other documents. While every effort has been made to retain the meaning of such documents, you are urged to rely upon the contents of such documents and only after a thorough review of the documents themselves.[1]

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, INCLUDING, WITHOUT LIMITATION, THE DEBTOR'S OPERATIONS, THE VALUE OF THE DEBTOR'S ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. UNLESS OTHERWISE EXPRESSLY STATED, PORTIONS OF THIS DISCLOSURE STATEMENT DESCRIBING THE DEBTOR HAVE NOT BEEN SUBJECT TO A CERTIFIED AUDIT BUT HAVE BEEN PREPARED FROM INFORMATION COMPILED BY THE DEBTOR FROM RECORDS MAINTAINED IN THE ORDINARY COURSE OF THE DEBTOR'S OPERATIONS. EVERY EFFORT HAS BEEN MADE TO BE AS ACCURATE AS POSSIBLE IN THE PREPARATION OF THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE PLAN PROPONENTS; IT IS NOT A SOLICITATION BY THEIR ATTORNEYS OR ANY OTHER PROFESSIONALS EMPLOYED BY ANY OF THEM. THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE PLAN PROPONENTS AND NOT OF THEIR ATTORNEYS OR ANY OTHER PROFESSIONAL.

REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS OR OTHER FINANCIAL INFORMATION WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS OR OTHER FINANCIAL INFORMATION, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE CERTIFICATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.

C.      **Voting Procedures.**

In accordance with Bankruptcy Code § 1122(a), the Plan classifies Claims into different Classes based on similarities and differences between the legal rights associated with the Claims and provides for how each Class of Claims will be treated. Specifically, the Plan classifies Claims against the Debtor into the following Classes:

---

[1] Such documents include, but are not limited to, pleadings filed in the Minnesota state court system, public real property records, and corporate formation documents and records, among other things.

| Class | Name | Impaired | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Employee Unsecured Claims | No | No - Deemed to Accept |
| 2 | Prepetition Date Secured Tax Claims | Yes | Yes |
| 3 | Faricy Claim | Yes | Yes |
| 4 | US Bank PPP Loan Claim | Yes | Yes |
| 5 | Catholic Charities Claims | Yes | Yes |
| 6 | General Unsecured Convenience Claims | Yes | Yes |
| 7 | General Unsecured Claims | Yes | Yes |
| 8 | Other Tort and Employee Claims | Yes | Yes |
| 9 | Annuity Claims | No | No – Deemed to Accept |
| 10 | Tort Claims | Yes | Yes |
| 11 | Unknown Tort Claims | Yes | Yes |
| 12 | Co-Defendant and Parish Claims | Yes | No – Deemed to Reject |
| 13 | Insurance and Benefit Claims | Yes | Yes |
| 14 | Penalty Claims | Yes | No – Deemed to Reject |

To confirm the Plan, at least one Class of Claims impaired by the Plan must vote to accept the Plan. For a Class of Claims to accept the Plan, votes representing at least two-thirds (2/3) in amount of the Claims in that Class that vote and more than one-half (1/2) in number of the Claims in that Class that vote must be cast in favor of accepting the Plan. The Plan's treatment of a Class will either "impair" the Claims in that Class or leave them "unimpaired." Claims are impaired if the Plan in any way alters the legal, equitable, or contractual rights associated with the Claims or if the Plan provides for paying less than the full amount of the applicable Allowed Claims. Holders of Claims in Classes that are impaired under the Plan may vote to either accept or reject the Plan; however, unless specifically noted in the Plan with respect to a particular Class, the act of voting and the substance of the vote will not alter a creditor's treatment. As more fully described below, the Debtor is seeking acceptances from holders of Allowed Claims in the Classes designated above as "Impaired; Entitled to Vote." If you are the holder of an impaired Claim that is entitled to vote, it is important that you vote.

The following Classes of Claims are not impaired under the Plan or are deemed to vote in favor of or against the Plan for the reason indicated:[2]

---

[2]     Holders of Claims that are unimpaired—that is, their rights are not altered and they will be paid or satisfied in full—are deemed to have accepted the Plan without voting. *See* Bankruptcy Code § 1126(f). Conversely, holders of Claims who will receive nothing under the Plan are deemed to reject the Plan without voting. *See* Bankruptcy Code § 1126(g).

QB\65418958.1

| Class | Description | Status |
|---|---|---|
| Unclassified[3] | Administrative Claims | Unimpaired—Deemed to Accept |
| Unclassified | Priority Unsecured Claims | Unimpaired—Deemed to Accept |
| Unclassified | Priority Tax Claims | Unimpaired—Deemed to Accept |
| Class 1 | Priority Employee Unsecured Claims | Unimpaired—Deemed to Accept |
| Class 9 | Annuity Claims | Unimpaired—Deemed to Accept |
| Class 12 | Co-Defendant and Parish Claims | Receive $0.00—Deemed to Reject |
| Class 14 | Penalty Claims | Receive $0.00—Deemed to Reject |

The specific treatment of each Class under the Plan is set forth in the Plan and is summarized in Article VIII of this Disclosure Statement. One or more Classes of Claims may have no creditors in that Class. In that event, under the terms of the Plan, that Class will be deemed automatically deleted from the Plan.

Bankruptcy Code § 1129(b) provides that, if the Plan is rejected by one or more impaired Classes of Claims, the Plan nevertheless may be confirmed by the Bankruptcy Court, if: (i) the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to each rejecting Class of Claims; and (ii) at least one Class of impaired Claims has voted to accept the Plan.

**THE DEBTOR AND THE COMMITTEE RECOMMEND THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

### III. OVERVIEW OF PLAN.

As discussed above, the Debtor filed this Reorganization Case in order to resolve creditors' Claims for Abuse (known and unknown), and, while achieving that goal within the limits of the Debtor's Assets, to restructure its financial affairs to preserve its ministries and missions. These ministries and missions are critical to Catholics and non-Catholics alike in at least sixteen (16) counties in Minnesota. The Debtor has proposed the Plan to accomplish these ends. The Plan will be funded by the Debtor.

The approximately $22.5 million cash fund to be established under the Plan represents significant efforts to liquidate Assets, downsize the Debtor, settle with insurance and benefits coverage providers, and obtain the significant contribution and support of certain Protected Parties. These monies will be used to fund the Trust that will pay the Tort Claimants pursuant to the Tort Claims Allocation Protocol attached to the Plan as Exhibit A and incorporated therein. The Trust will also pay the Unknown Tort Claimants pursuant to the Unknown Tort Claims Allocation Protocol, attached to the Plan as Exhibit B and incorporated therein, through the Reorganized Debtor's Unknown Tort Claims Obligation. The Trust will be administered by a Trustee. The initial Trustee will be chosen by the Committee.

---

[3]    The treatment of unclassified Claims is prescribed by the Bankruptcy Code and, accordingly, the holders of those Claims do not vote.

QB\65418958.1

The Debtor believes that the Plan provides greater compensation to the Tort Claimants and the Unknown Tort Claimants than they would likely receive outside Chapter 11 because of, among other things:  (i) the number of Tort Claims; and (ii) the limited resources of the Debtor to respond to potential judgments outside the Reorganization Case.

Additionally, to fund the Plan, the Debtor sold, pre-petition, certain real property that was not critical to the mission and ministry of the Debtor.  To further generate funds for the Debtor's contribution to the Plan, the Debtor may sell additional real property or use it as collateral for loans.  In certain cases, the Debtor will utilize property that is critical to its mission and ministry, but the Debtor is committed to being able to consummate a plan that is beneficial to the Tort Claimants and the other interested parties.

The Plan Proponents estimate that administrative fees will be equal to or less than $500,000.00, which will be paid through the Administrative Claim Reserve.  If the Administrative Claims do not exceed $500,000.00, the Debtor will pay such Claims from Assets that would not otherwise go to Tort Claimants under the Plan.

## IV.    THE DEBTOR.

### A.      The History and Structure of the Diocese.

In 1889, the Roman Catholic Church established the canonical Diocese of Saint Cloud, which is comprised of all people who are Latin Rite Catholics within the territorial boundaries of the Diocese.  The canonical entity carries out the mission and ministry of the Roman Catholic Church in accordance with Canon Law.[4]

On January 13, 1900, the civil corporation, The Diocese of St. Cloud, was formed as a Minnesota religious corporation.  The purpose of the civil corporation was to take charge of, and manage, all secular affairs and property of the Diocese and to promote the spiritual, educational, eleemosynary, missionary, and other interests of the Roman Catholic Church in the Diocese's geographic territory.  It is this civil Minnesota religious corporation which is the Debtor in this case.  The Debtor holds and manages all the Diocese's temporal assets, including real property, personal property, and investments for the purpose and benefit of the Diocese's ecclesiastical obligations.  The Debtor's Articles of Incorporation, as amended, are recorded in Book A, page 48, of the Religious Corporations register, maintained by the County Recorder for Stearns County, Minnesota.  The Debtor's principal offices are located in St. Cloud, Minnesota

The Debtor has three (3) *ex officio* members—(1) the Bishop; (2) the Vicar General; and (3) the Chancellor.  In addition, two (2) members are appointed by the *ex officio* members every

---

[4]      The Roman Catholic Church is a hierarchical religious organization governed by its own laws and customs.  These laws are codified in the Code of Canon Law.  The Code of Canon Law applicable to the Roman Catholic Church is, for the most part:  (1) a set of norms created to bring order to the life of the ecclesial community; (2) articulated and promulgated by those who are entrusted with the community's care; and (3) to serve the common good, thus imposing obligations and establishing legal bonds from which certain rights, duties, and interests flow.

QB\65418958.1

two years.  The members comprise the board of directors of the civil corporation.  The current board of directors are (1) Bishop Donald J. Kettler, (2) Rev. Robert Rolfes (the Vicar General of the Diocese), (3) Jane Marrin (the Chancellor of the Diocese), (4) Rev. Leroy Scheierl, and (5) Rev. Donald Wagner.  The officers of the civil corporation are:  (a) the Bishop is the *ex officio* President of the Debtor, Chairman of the board of directors, and the Chief Executive Officer; (b) Vicar General is the *ex officio* Vice President of the Debtor; and (c) the Secretary and Treasurer of the Debtor are elected annually.  The majority of the directors have the power to transact all business of the Debtor.  The board of directors has authorized the Bishop to take all actions necessary in the Reorganization Case.

The Diocese's geographic territory encompasses 12,251 square miles in 16 counties in central Minnesota.  These counties include Stearns, Sherburne, Benton, Morrison, Mille Lacs, Kanabec, Isanti, Pope, Stevens, Traverse, Grant, Douglas, Wilkin, Ottertail, Todd, and Wadena.  There are approximately 133,000 registered Catholics within the geographic territory of the Diocese.  There are 131 Parishes within the geographic territory of the Diocese, all of which are separate and independent entities.  There are also other separate and independent entities that operate within the territory of the Diocese that support the mission and ministry of the Catholic Church within the Diocese, including schools that provide a Catholic education for students.

Currently, 63 full-time priests and 50 permanent deacons serve in the Diocese.  Overall, men and women from 11 different religious communities serve within the Diocese.  The Diocese employs approximately 64 people, and a significant number of additional people offer their services as volunteers to the Diocese.

Bishop Kettler was appointed bishop of the Diocese on September 20, 2013 and installed on November 7, 2013.  Bishop Kettler graduated from the Crosier Seminary, Onamia, Minnesota, and has two college degrees from St. John's University, Collegeville, Minnesota.  He is also a canon lawyer, having received his licentiate in Canon Law in 1983 from The Catholic University of America in Washington, D.C.

Bishop Kettler served in various places and capacities since he was ordained a priest in 1970 in St. Joseph Cathedral, Sioux Falls, South Dakota.  He served as an associate pastor in Aberdeen and Sioux Falls until 1979, when he began coordinating work for the diocesan offices of Sioux Falls.  After earning his Canon Law degree, he was named judicial vicar of Sioux Falls in 1983 and resumed his work coordinating its diocesan offices from 1984 to 1987.  He served in various capacities in the Sioux Falls diocese until 2002 when Pope John Paul II appointed him as the fourth Bishop of the Diocese of Fairbanks, Alaska, where he, among other things, oversaw the successful 2010 Chapter 11 reorganization of the Fairbanks diocese.  He served as the Bishop of Fairbanks until 2013, when he was appointed to his current position.

### B.     Mission and Ministry.

The Diocese provides spiritual guidance to the missions, Parishes, volunteers, and other individuals within its geographic territory, and also material assistance in the form of charitable activities.  The Diocese also provides administrative services to the Parishes that require assistance, such as financial services, a pension plan, and insurance programs.

The Diocese supports a number of programs within its territory. The Diocese, in support of the Office of the Bishop, provides administrative and other support and spiritual guidance to pastors, Parishes, volunteers, and other individuals within its geographic territory. The Diocese also assists individuals in carrying out the mission of the Roman Catholic Church through pastoral care and socially beneficial programs such as: (i) programs to implement and enforce the Diocese's Safe Environment Program; (ii) programs to promote, encourage, and support priest and deacon formation and support; (iii) programs to provide and promote opportunities for leadership and educational opportunities for Parishes and staff within the geographic area of the Diocese; and (iv) production and publication of a monthly magazine and other religious communications within the geographic area of the Diocese.

### C.    Funding Operations.

To carry out its mission, the Debtor receives funding from various sources. For example, as provided under Canon Law, the Bishop assesses each Parish an amount which it is to remit to the Diocese to support its operations and ministry and to compensate the Diocese for its administrative support. Given the financial circumstances of the Parishes and the parishioners who financially support their Parishes, these assessments are not sufficient to support all of the operating costs of the Debtor.

Throughout the year, the Debtor also receives donations from various sources and through the Bishop's Appeal, which is the Debtor's annual fundraising campaign. These donations are restricted by the donor for a specific purpose. The Debtor asserts that those donations can only be used for that purpose, and that it holds those donations in trust to be used only as the donor has directed. In addition, the Diocese applies for, and from time to time receives, grants from the Catholic Foundation for the Diocese of St. Cloud, a Minnesota nonprofit corporation. These grants are generally applied for and awarded for a specific purpose; they are not for the general unrestricted use of the Debtor. None of these funds will be used to pay creditors in this case.

The Debtor, as custodian, also collects funds for specific Catholic programs, such as support of missions. These collections are generally done on a national or international basis by parishes and dioceses throughout the world. People or entities that donate funds do so specifically for the particular cause or program. The funds are remitted to the Debtor, which holds the funds for only a short period of time and then remits them to the entity for whose benefit the funds have been given. The Debtor asserts that it is a custodian of such funds for others.

### D.    The Debtor's Assets.

A description of the Debtor's Assets follows. A balance sheet summarizing the Debtor's Assets and liabilities is also attached to the Disclosure Statement as **Exhibit 1**.

1.      **Real Property.**[5]

The Debtor owns the following real property and improvements:

a)      **Chancery Property**.  Currently, the Chancery Property is the Debtor's principal place of business where most administrative staff offices are located.  The Debtor estimates the value of the Chancery Property at $975,000, based on a broker's opinion of value.  The Debtor may seek to sell a portion of the Chancery Property to fund the Plan.

b)      **Pastoral Center**.  The Debtor owns the Pastoral Center and the adjacent Pastoral Center Lot.  These properties are used for staff offices and administrative purposes.  The Debtor estimates the value of the Pastoral Center at $1.2 million, based on a broker's opinion of value.  The Debtor estimates the value the Pastoral Center Lot at $24,000, based on a broker's opinion of value.  The Pastoral Center is crucial to the Debtor's on-going operations.  The Debtor does not plan to sell the Pastoral Center or Pastoral Center Lot.

c)      **Children's Home Property**.  The Debtor owns two parcels of real property and improvements referred to as the Children's Home Property.  The Debtor estimates the value of the Children's Home Property between $3.9 million and $5.5 million, based on a broker's opinion of value and marketing efforts.[6]  The Debtor leases portions of the Children's Home Property to two entities:  District 742 Community Schools (the "**School District**") and Catholic Charities.  Collectively, the leases generate approximately $100,000.00 in annual income for the Debtor.  The School District operates a school on the premises, and Catholic Charities provides certain child and adult social services on the premises.  The Debtor may seek to sell the Children's Home Property to fund the Plan.

d)      **Cemeteries**.  The Debtor owns three (3) cemetery properties: (1) 1 Acre Cemetery Tract, NWNW Section 27 Township 126 Range 035, Rural Sauk Centre, MN; (2) 1.19 Acre Cemetery, 21953 Memorial Drive, Glenwood, MN; and (3) Greenbusch Cemetery, 511 13th Avenue North, Princeton, MN.  These properties are not marketable and have no market value.  The Debtor does not believe the cemeteries are saleable Assets; therefore, the estimated value of these properties is $0.00.  Upon the Effective Date, the cemeteries will become a Revested Asset.

---

[5]      The real property values noted in this section are based on a broker's unofficial estimate of value.  The values do not necessarily represent the current market value, and there is no guarantee that the Debtor will be able to realize these estimated values through a sale or collateralized loan.  The Debtor reserves all its rights regarding the market value of these properties.

[6]      As noted herein, Catholic Charities has filed a lawsuit and recorded a lis pendens related to the Children's Home Property.  The estimated value of the Children's Home Property does not account for Catholic Charities' Claims.

QB\65418958.1

### 2.      Cash and Investments.

The Debtor maintains deposit and investment accounts at national banks to use for its operations and to fund the Plan.  A description of these accounts is set forth in the *Notice of Hearing and Motion for Order (I) Granting Expedited Relief, (II) Authorizing Continued Use of the Debtor's Cash Management System, and (III) Authorizing Maintenance of the Debtor's Existing Bank Accounts* [Docket No. 10] (the "**Cash Management Motion**").[7]

As of the Petition Date, the Debtor had approximately $173,232.41 in its primary checking account.

The Debtor maintains three investment accounts: a Charles Schwab investment account, a U.S. Bank settlement account, and a Bremer Bank annuity account.  Charles Schwab manages the Charles Schwab account investments.  The funds are invested in low-risk bonds (85%) and index mutual funds (15%).  Certain donor-restricted funds, unrestricted funds, and funds held for others are pooled by Charles Schwab for investment purposes only.  The Debtor maintains accurate account of these classes of funds.  As of the Petition Date, the Debtor held approximately $318,027.00 of unrestricted funds in the Charles Schwab account.  The unrestricted funds in this account may be used to fund to the Plan or ongoing operations.[8]

As of the Petition Date, the Debtor's investment account at U.S. Bank held approximately $14.2 million.  The Debtor generated these funds prepetition from various sources, including: (i) selling certain Debtor Assets (as disclosed in the Debtor's statement of financial affairs), and (ii) settling with certain insurance and/or benefits coverage providers.  The Debtor segregated the funds in this account for the purpose of funding the Plan.  The funds are invested in multiple certificates of deposit, each of which is below the FDIC insurance limit.

Finally, the Debtor holds fully-funded reserves for its Annuity obligations at Bremer Bank. Bremer Bank manages these funds and pays Annuitants.  As of the Petition Date, approximately $332,863.00 was held in the Annuity reserve.  The funds in this account are designated to pay Annuitants, as provided in the Plan.

### 3.      Other Personal Property.

As described in its Schedules, the Debtor owns various useful personalty needed for its operations (*i.e.*, desks, chairs, computers, and general office equipment).  The Debtor does not

---

[7]      The description of the Debtor's accounts in this Disclosure Statement does not include (i) accounts containing funds held for the benefit of others; such funds are not property of the Debtor's Estate, or (ii) accounts containing only donor-restricted funds; such funds cannot be used to fund the Plan or pay creditors.  These types of accounts are more particularly described in the Cash Management Motion and the Debtor's Schedules.

[8]      At the request of the United States Trustee, the Debtor has or will move unrestricted funds held in the Charles Schwab account to the U.S. Bank Settlement Account.

QB\65418958.1

believe that the personal property has significant market value. The Debtor does not anticipate liquidating these items.

The Debtor has interests in certain accounts receivable, the collectability of which is unknown. The Debtor owns limited china, art, and jewelry, which has insignificant market value. Finally, the Debtor owns approximately six (6) passenger vehicles that are used by the Debtor for mission and ministry-related transportation and for operations. The make, model, and year of the vehicles are set forth in the Schedules. The Debtor does not anticipate liquidating these items.

### 4.   Discussion of Avoidance Actions.

The Debtor has investigated its books and records and does not believe that it has any colorable avoidance actions, *provided, however, that* the Debtor is still investigating a potential Avoidance Action it may have against Faricy. Prepetition, Faricy received significant payments from the Debtor based on hourly fee statements. While the Debtor is still investigating the issue, it appears that Faricy may have received these funds without providing reasonably equivalent value in return. The Debtor reserves all its rights with respect to all potential Avoidance Actions, including any action against Faricy. All such Avoidance Actions, including all Avoidance Actions against Faricy, are Retained Claims under the Plan.

### E.   The Debtor's Liabilities.

### 1.   Tort Claims.

By far, the Debtor's largest liabilities are the Tort Claims. Through the settlement account funds (described above), funds from the Parishes described herein, and the sale or collateralization of certain Debtor Assets, the Debtor will provide funds for the payment of Tort Claims. This is being done only for purposes of the Plan and does not constitute an agreement or admission of liability for any Tort Claims.

### 2.   Faricy Claim.

In 2015, the Debtor engaged Faricy under the Faricy Agreement to represent the Debtor in its dispute with Arrowood Indemnity Company ("**Arrowood**"). Due, in part, to Faricy's ineffective counsel, the dispute with Arrowood was expensive and drawn-out. In the end, Faricy's employment was effectively terminated. Other than its ineffective work on the Arrowood matter, Faricy provided no other services to the Debtor. The Debtor retained new insurance counsel— Blank Rome—which was able to negotiate a beneficial settlement with Arrowood in a very short time. Moreover, the Debtor's other counsel—Quarles & Brady LLP and Meier, Kennedy & Quinn, Chartered—were required to spend significant time supplementing Faricy's ineffective work. Although Faricy did very little to benefit the Debtor, Faricy received over $300,000.00 in payments from the Debtor. Even so, Faricy submitted an additional prepetition bill to the Debtor in the amount of $585,623.20. The vast majority of that bill was based on an unearned, alleged contingency fee to which Faricy asserts it is entitled as a result of the $3 million Arrowood settlement.

In addition, after the Petition Date, Faricy filed Proof of Claim No. 9, wherein Faricy asserts an Unsecured Claim in the unsupported amount of $2,125,673.50. In essence, Faricy seeks to recover from the Debtor over $2 million from a $3 million settlement that Faricy did little to generate. As noted herein, the $3 million Arrowood settlement proceeds will be used to compensate survivors of Abuse, and Faricy's attempts to take money away from survivors is not well taken.

The Debtor disputes the amount of the Faricy Claim. The Debtor also asserts that it may have an Avoidance Action and other Claims against Faricy based on, among other things, malpractice and prepetition transfers the Debtor made to Faricy. All Claims the Debtor may assert against Faricy are Retained Claims under the Plan. If and when the Faricy Claim is Allowed, it will be treated as an Unsecured Claim and paid in the full Allowed amount over 60 months, as set forth in the Plan. In the alternative, Faricy can elect to receive a lump-sum $300,000.00 payment on the Effective Date in full satisfaction of the Faricy Claim.

### 3.      US Bank PPP Loan Claim.

As a result of the COVID-19 pandemic, the Debtor obtained an unsecured "Payment Protection Act" loan from U.S. Bank in the original principal amount of $512,500.00 (the "**PPP Loan**"). The SBA fully guaranteed the PPP Loan. The Debtor is not required to make payments under the PPP Loan Documents at this time. The Debtor believes that it has met (or will meet) all of the requirements for the PPP Loan to be fully forgiven in accordance with the current SBA regulations. In the unlikely event that the PPP Loan is not forgiven, the Debtor will pay the PPP Loan in accordance with the PPP Loan Documents, as set forth in the Plan.

### 4.      Catholic Charities Claim.

As set forth in the *Notice of Hearing and Motion for an Order (I) Granting Expedited Relief, (II) Approving Settlement Agreement, and (III) Approving Lease Amendment and Services Agreement* [Docket No. 76], Catholic Charities filed a lawsuit against the Debtor, styled as *Catholic Charities for the Diocese of St. Cloud v. The Diocese of St. Cloud*, Case No. 73-CV-18-5584, wherein it asserted certain unjust enrichment and other Claims against the Debtor related to the Children's Home Property. Subject to the Effective Date of the Plan, those Claims have been resolved through the Catholic Charities Settlement Agreement. Through that agreement, Catholic Charities agreed to release all Catholic Charities Claims on the Effective Date of the Plan—a contribution Catholic Charities values at over $4 million. In exchange, Catholic Charities will be deemed a Protected Party under the Plan. The Catholic Charities Settlement Agreement will constitute the sole treatment of the Catholic Charities Claims.

### 5.      Annuities.

In the past, the Debtor raised funds through charitable gift annuities, defined in the Plan as Annuities. The Debtor no longer raises funds in this manner, but it still has prior Annuity obligations. These Annuities are often incorporated into retirement portfolios, and many Annuitants rely on their Annuity payments as income. Such retirement income reliance is a reason that it is essential that Annuity payments continue to be made by the Debtor throughout the Reorganization Case. The Debtor maintains fully funded reserves, as discussed above, from which

the regular Annuity payments to the Annuitants are made.  Bremer Bank manages these funds and makes payments to Annuitants.

Each Annuity is evidenced by a contract, defined in the Plan as the Annuity Agreement, which dictates the payment Bremer Bank is required to make to the Annuitant.  A list of Annuity obligations is attached to the Debtor's Schedules.

Although the exact amount of Annuity liability cannot be predicted (because it is predicated on the ever-changing life expectancy of the donor), the Debtor has estimated the liability based on actuarial calculations.  On the Petition Date, the Debtor was holding a reserve fund of approximately $332,863.20 to cover its Annuity liability.

### 6. Employee Claims.

The Debtor also owes various employees accrued sick and vacation time, and other benefits.  Most of these amounts are subject to priority status; however, because most will likely be used as time off, the Debtor does not expect to pay out dollars on the majority of these Claims.  If an employee's employment terminates during the Reorganization Case, he or she may be entitled to a Cash payout at that time.  However, the Debtor does not anticipate any employee terminations at this time.

### 7. Trade Debt and Other Unsecured Claims.

The Debtor generally pays its trade debt in the ordinary course of business.  However, to the extent some amounts remained unpaid as of the Petition Date, the Debtor estimates that these amounts are fairly minimal and will likely total, in the aggregate less than $10,000.00.

## V. SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE.

### A. The Sexual Abuse Crisis and the Diocese's Response.

Unfortunately, the Diocese has not been immune from the sex abuse scandal that has affected so many entities within the Catholic Church.  The currently unresolved claims against the Debtor were, for the most part, filed in response to the 2013 Minnesota Child Victims Act (the "**MCVA**"), which allowed for the filing of claims for a three-year period after its passage.  That window expired in May 2016.  Formal and informal Claims alleging Abuse at the hands of priests and other workers in the Roman Catholic Church have been asserted against the Debtor.  As of the Petition Date, there were 73 unresolved claims, 71 of which were filed in response to the MCVA's window and alleged abuse that occurred decades ago.  Of those unresolved claims, 4 were in active litigation in Minnesota state court on the Petition Date.

Given the Debtor's limited Assets, the Debtor did not have the means to fairly compensate all Tort Claim survivors.  Therefore, after extensive negotiations, the Debtor and the survivors have agreed on a framework to resolve all Abuse Claims.  That agreement provides $22.5 million (with some minor limitations) to compensate survivors.  The framework could only be effectuated through this Reorganization Case.  The Plan embodies that framework.

-13-

The Diocese remains committed to preventing Abuse, holding accountable those clergy and other individuals who are credibly accused of abuse, and helping survivors find healing. The inexcusable harm caused by the abusers to the survivors of the Abuse, their families, and their communities cannot be overstated. The abusers also betrayed and harmed the Catholic community and the Roman Catholic Church. A list of certain individuals associated with the Diocese who are known to the Debtor to have been credibly accused of Abuse is displayed on the Diocese's website at http://stcdio.org/list-clergy-likely-abused-minors/. This list may be supplemented from time to time. The list includes the Parishes where each of those clergy served within the Diocese. It also includes religious community clergy members who served in Parishes in the Diocese and the names of several men of a religious community from outside the Diocese who served in schools within such Diocese. Religious orders of men with communities in the Diocese maintain similar clergy lists.

Although the Diocese cannot change the tragedies of the past, it has long been committed to combating Abuse of minors. In June 2002, the United States Conference of Catholic Bishops adopted the "Charter for the Protection of Children and Young People" (the "**Charter**"). The Charter, among other things, established the Office of Child and Youth Protection (the "**OCYP**"). OCYP assists dioceses in implementing the Charter to ensure consistent application of guidelines and procedures to prevent Abuse of minors and properly address allegations of misconduct. The Diocese adopted the Charter and remains committed to the implementation of the Charter and following the procedures and guidelines to prevent Abuse of minors, as well as dealing proactively and diligently with allegations of misconduct, regardless of when they were alleged to have occurred.

Within the Diocese, the "Safe Environment Program" emphasizes prevention by communication to all parishioners that Abuse must be reported, requiring background checks on all adults working with minors and vulnerable adults, and requiring each school and Parish in the Diocese to have a Site Administrator who oversees the local program and makes sure all training and background checks are up-to-date. Additionally, all individuals that minister with minors and vulnerable adults must successfully complete the training program developed by Catholic Mutual entitled "Safe Haven". The Bishop has been a leader in protection of children and young people in the various dioceses in which he has served, including the Diocese.

The harm that was caused by the abusers is unacceptable. Also unacceptable is that the voices of the survivors were not heard for too long. Too often when survivors or others on their behalf reached out to the Diocese in the past, their Abuse was not adequately addressed or taken seriously. Unfortunately the Diocese was not alone in this respect. However, starting with adoption of the Charter in 2002 and continuing thereafter, the Debtor and the Diocese began instituting policies and procedures to address these issues, including establishment of the Victim Assistance Coordinator. The Diocese and the Reorganized Debtor are committed to continue their efforts in this regard. Improvements can always be made and the non-monetary commitments that comprise a part of the Plan are part of the ongoing effort of the Diocese and the Reorganized Debtor to review and improve on the protections and procedures that are already in place.

The Bishop has previously apologized to survivors for the inexcusable acts that occurred and for past Bishops' failures to adequately address reports of Abuse, and has promised a different response by this administration. **The Bishop, the Debtor, and the Diocese want to take the**

QB\65418958.1

**opportunity provided by this Disclosure Statement to once again apologize to the survivors and their families for the inexcusable harm that was done to them by those in positions of trust and to again commit to be mindful of the need for vigilance and to ensure that the protections that are already in place continue, as augmented by the non-monetary commitment to healing and reconciliation set forth in <u>Section 20.9</u> of the Plan**.

In addition to <u>Section 20.9</u> of the Plan, the monetary commitments included in the Plan for compensation of Tort Claimants, and the treatment of Unknown Tort Claims are another step in the efforts of the Debtor and the Diocese to bring some healing and closure to the survivors.

The Diocese and the Debtor appreciate that there have been too many instances where the survivors' voices have not been heard or acted upon appropriately in the past. That has changed and, as noted, improvements can always be made. The Plan is a step towards continuing to bring these past acts to light and continuing to examine and improve the policies, procedures, and responses to protect the Diocese's most valuable resource—its children and other young people.

### B.    <u>Tort Lawsuits.</u>

As noted above, numerous formal and informal Claims alleging Abuse by priests, clergy, and others have been asserted against the Debtor. As further detailed below, as of the Petition Date, there are 73 unresolved claims, 71 of which were filed in response to the MCVA. Four claims were in active litigation prior to the Petition Date. The various named Co-Defendants (including third-party plaintiffs) in the state court cases are listed in the Debtor's Schedule F [Docket. No. 49]. Other Claims are not currently in litigation at this time, because: (i) the survivor reported Abuse to the Diocese, but was unwilling to pursue any formal Claim; (ii) the Diocese has been advised of a potential Claim but no lawsuit has yet been filed; or (iii) the Diocese previously settled the survivor's Claim/lawsuit.

In May, 2013, the Minnesota state legislature passed the MCVA, Minn. Stat. § 541.073. This act extended the time for people who were abused before they reached the age of majority to file certain previously time-barred Claims relating to the Abuse. Such Claims considered to be timely if filed on or before May 25, 2016.

After the enactment of the MCVA, personal injury attorneys, including Jeff Anderson & Associates, PA, the attorneys representing most of the Tort Claimants with pending lawsuits, ran statewide newspaper notifications which informed survivors about the statute of limitations extension. The Debtor understands that the Anderson firm also did limited radio notifications to survivors and limited outreach letters to former students who may have attended a school where one of the credibly accused perpetrators worked. Therefore, there has already been a significant amount of publicity and notice to potential claimants as a result of the efforts of the Debtor as well as personal injury lawyers.

The Debtor lacks the financial ability to deal with the large number of Claims now pending against it. Additionally, the Debtor has limited ability to pay the Tort Claims because the Debtor had limited insurance and/or benefits coverage. Catholic Mutual and Arrowood settled with the Debtor prepetition and provided substantial funds for the Plan.

-15-

This concatenation of circumstances forced the Debtor to find a way to deal with the Claims all at once, rather than allowing it to deal with them on a one-by-one basis as it had in the past. With the support of survivors, the Debtor filed the Reorganization Case in an effort to provide just compensation to all Abuse claimants and other creditors while preserving its ministry and mission.

## VI.    CHAPTER 11 FILINGS.

### A.    First Day Motions.

Upon filing its Chapter 11 petition, the Debtor filed certain "first day" motions. The Court granted the following motions:

**1.    Cash Management Motion.** A motion that sought to excuse the Debtor from complying with certain United States Trustee obligations relating to the Debtor's bank accounts. *See Notice of Hearing and Motion for Order (I) Granting Expedited Relief, (II) Authorizing Continued Use of the Debtor's Cash Management System, and (III) Authorizing Maintenance of the Debtor's Existing Bank Accounts*, at Docket No. 10.

**2.    Wage and Benefits Motion.** A motion to pay certain pre-petition wages and compensation, and honor employee benefit plans and programs under 11 U.S.C. §§ 105, 363 and 507 in order to retain current employees. *See Notice of Hearing and Motion for an Order Under 11 U.S.C. §§ 105, 363, and 507 (I) Granting Expedited Relief, (II) Authorizing the Debtor to Pay Prepetition Wages and Expense Reimbursements, (III) Authorizing the Debtor to Honor Employee Benefits Accrued Prepetition, and (IV) Granting Related Relief*, at Docket No. 11.

**3.    Under Seal Motion.** Because of the sensitive nature of the Tort Claims and the Debtor's desire to protect the privacy of the Tort Claimants, the Debtor requested that certain information regarding the Tort Claimants be filed and maintained under seal. *See Notice of Hearing and Motion for an Order Under 11 U.S.C. § 107 and Fed. R. Bankr. P. 1007(j) and 9018 (I) Granting Expedited Relief, (II) Authorizing the Debtor to File Portions of Documents Under Seal, and (III) Requesting Related Relief*, at Docket No. 12.

**4.    Q&B Employment.** An application to employ Quarles & Brady LLP as general reorganization and restructuring counsel for the Debtor. *See Application for an Order Authorizing the Debtor to Employ Quarles & Brady LLP as General Reorganization and Restructuring Counsel*, at Docket No. 8.

**5.    Unknown Claims Representative Appointment.** An application to appoint a legal representative for Unknown Tort Claimants and to employ The Hon. (Ret.) Michael R. Hogan as the Unknown Claims Representative. *See Notice of Hearing and Motion for an Order (I) Granting Expedited Relief, (II) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, Including Minors, and (III) Granting the Application to Employ Michael R. Hogan as Unknown Claims Representative*, at Docket No. 13.

> 6.    **MKQ Employment**.  An application to employ Meier, Kennedy & Quinn, Chartered as special defense and litigation counsel for the Debtor.  *See Application to Employ Meier, Kennedy & Quinn, Chartered as Special Defense and Litigation Counsel*, at Docket No. 9.[9]

B.    <u>**Schedules & Statements**</u>.

The Debtor filed its Schedules and statements on July 7, 2020 at Docket Nos. 49 and 50. The information in these documents was drawn from the Debtor's books and records, and other sources.  The Debtor did not include the Tort Claims on its publicly filed Schedules.  Rather, the Debtor submitted a confidential Schedule E/F to protect the privacy of the Tort Claimants.

C.    <u>**Proof of Claim Deadline and Notice**</u>.

The Bankruptcy Court also entered the Proof of Claim Deadline Order, which the Debtor requested in an effort to further determine the universe of Claims that will be dealt with under the Plan.  The Proof of Claim Deadline Order set **October 21, 2020** as the last day to timely file a Proof of Claim (except claims of governmental units).  In the Proof of Claim Deadline Order, the Court also approved Proof of Claim forms, form of notices and an extensive publicity and publication campaign and other procedures for giving notice of the deadline to file Proofs of Claim.

After entry of the Proof of Claim Deadline Order, the Debtor engaged in the extensive publicity and publication campaign it had designed to reach the maximum number of potential Tort Claimants, which was approved by the Bankruptcy Court in the Proof of Claim Deadline Order.  Information regarding the publicity and publications undertaken can be found in the Proof of Claim Deadline Order.  This publicity supplemented the prior efforts undertaken by the Diocese and by various personal injury lawyers, including Jeff Anderson & Associates, P.A., after the enactment of the MCVA.

D.    <u>**Formation of Official Committee of Unsecured Creditors**</u>.

On June 18, 2020, the United States Trustee ("**UST**") formed an Official Committee of Unsecured Creditors that includes various holders of Tort Claims.  The Committee retained Stinson LLP as its reorganization counsel.  [Docket No. 28.]  The Committee has participated actively in the Reorganization Case and is a joint proponent of the Plan.

E.    <u>**Broker Application**</u>.

On July 13, 2020, the Debtor filed an *Application for an Order Authorizing the Debtor to Employ Granite City Real Estate LLC as Real Estate Broker* [Docket No. 60], seeking to employ Granite City Real Estate as real estate broker to market and potentially sell portions of the Chancery Property and the Children's Home Property to fund the Plan.  The Court entered an order

---

[9]    Although not filed on the first day, shortly after the Petition Date, the Debtor also filed an application to employ Thomas A. Janson as special counsel for the Debtor.  *See Application to Thomas A. Janson d/b/a The Janson Law Office as Special Counsel*, at Docket No. 45.

approving the application on July 13, 2020 [Docket No. 61]. The broker is actively marketing the properties.

### F.     Catholic Charities Settlement.

As set forth in the *Notice of Hearing and Motion for an Order (I) Granting Expedited Relief, (II) Approving Settlement Agreement, and (III) Approving Lease Amendment and Services Agreement* [Docket No. 76], Catholic Charities filed a lawsuit against the Debtor, styled as *Catholic Charities for the Diocese of St. Cloud v. Diocese of St. Cloud*, Case No. 73-CV-18-5584, wherein it asserted certain unjust enrichment and other Claims against the Debtor related to the Children's Home Property. Subject to the Effective Date of the Plan, those Claims have been resolved through the Catholic Charities Settlement Agreement. Through that agreement, Catholic Charities agreed to release all Catholic Charities Claims on the Effective Date of the Plan—a contribution that Catholic Charities values at over $4 million. In exchange, Catholic Charities will be deemed a Protected Party under the Plan. The Catholic Charities Settlement Agreement will constitute the sole treatment of the Catholic Charities Claims.

### G.     Executory Contracts.

The Debtor has several Executory Contracts. The most significant Executory Contracts are the School District lease and the Catholic Charities lease related to the Children's Home Property. The net effect of these leases generates approximately $100,000.00 annually, which the Reorganized Debtor will use to fund operations (unless the Debtor must sell the Children's Home Property to fund the Plan).

As set forth in the Schedules, the Debtor also has unexpired leases of office copiers and postal machines. The Debtor expects to assume these Executory Contracts. The Debtor believes that little to no cure amounts will be required to assume the personal property leases.

## VII.   ANTICIPATED CHAPTER 11 EVENTS.

In addition to the motions already filed, the Debtor anticipates that it will file certain motions described below, or that certain events described below are likely to occur in the Reorganization Case.

### A.     Potential Sales of Property.

The Debtor anticipates marketing portions of the Chancery Property and the Children's Home Property for sale. The Debtor will file motions to approve any such sales, subject to notice and hearing. Proceeds from such sales (if any) will be used to fund the Plan.

### B.     Potential Post-Petition/Exit Financing.

If the proceeds from sales of the portions of the Chancery Property and the Children's Home Property are insufficient to fund the Debtor's obligations under the Plan, the Debtor will seek to borrow the required funds from the D&L Lender. Such loan (if any) may be secured by

-18-

some of the Debtor's real and personal property assets.  If such loan is necessary, the Debtor will file a motion to approve the loan, subject to notice and hearing.

### C.    Plan Confirmation.

The Debtor worked closely with the Committee throughout the Plan process in an attempt to jointly propose a plan that will be acceptable to its creditors.  The Plan Proponents obtained approval of the Disclosure Statement, balloting procedures, and scheduling of Plan confirmation proceedings.

### D.    Fee Applications.

All Chapter 11 Professionals must have their Professional Charges approved by the Court prior to being paid.  The Debtor has budgeted approximately $500,000.00 for total Professional Charges in the Reorganization Case.  The Debtor will fund the first $500,000.00 of Professional Charges.  Any amounts above $500,000.00 will come from the $22.5 million settlement funds. Nevertheless, because final fee applications will not be approved until after the Trust has been funded, prior to the Confirmation Date the Debtor and Committee will stipulate to an amount for the Debtor to retain as a reserve for the payment of Allowed Administrative Claims, including Professional Charges.  Once all pending applications for such Claims are approved or denied by a Final Order and the Allowed Claims are paid, any amounts held from funding to the Trust as part of the Administrative Claims Reserve that are not paid on account of Administrative Claims, including Professional Fees, will be remitted to the Trustee.

## VIII.    DESCRIPTION OF PLAN AND MEANS FOR EXECUTION.

### *THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF, WHICH CONTROLS.*

As stated above, the Plan is premised on the contribution of approximately $22.5 million to fund the Plan and related expenses.  Parishes will contribute approximately $1.7 to $2 million to fund the Plan.[10]  The Debtor will contribute all funds necessary to fund the $22.5 million trust, less any funds held back for the Administrative Claims Reserve.  The funds and Debtor's Assets will be used for, among other things, payment of Claims, which will be treated as follows:

### A.    Claims Description and Treatment.

Treatment of different Classes of Claims and unclassified Claims is described below. However, whether or not any payment is made on account of a Claim under the Plan depends on whether it is a Tort Claim (the definition of which includes Unknown Tort Claims for this purpose), or, if not, whether it is allowed by the Bankruptcy Court.  Tort Claim determination and distribution will be governed by the Plan, the Allocation Protocols, and Trust Agreement attached to and incorporated into the Plan as Exhibits A, B, and E.  A Claim that is not a Tort Claim may

---

[10]      As described in the Catholic Charities Settlement Agreement, Catholic Charities will contribute released Claims but no Cash.

-19-

be Allowed in one of three ways:  (1) it was listed in the Debtor's Schedules as undisputed and in a liquidated amount even if no Proof of Claim was filed by the holder of the Claim; (2) a timely Proof of Claim was filed by the holder of the Claim and no objection to the Proof of Claim was timely filed in accordance with the treatment the applicable Class of Claims; or (3) if an objection was filed to a Proof of Claim, then upon entry of a Final Order allowing the Claim.

As of the Confirmation Hearing, any Class of Claims that does not contain any creditor's Claims will be deemed deleted automatically from the Plan, and any Class of Claims that does not contain an Allowed Claim (or a Claim temporarily or provisionally Allowed by the Bankruptcy Court for voting purposes) will be deemed automatically deleted from the Plan with respect to voting on confirmation of the Plan only.

### B.    Unclassified Claims.

The Plan identifies several types of Claims as unclassified and treats those Claims in accordance with the Bankruptcy Code and applicable law:  Administrative Claims, Priority Unsecured Claims, and Priority Tax Claims.

Administrative Claims include any actual and necessary costs or expenses of administration of the Estate under Bankruptcy Code § 503, post-petition operating expenses, certain post-petition property tax claims (of which the Debtor believes there are none), and charges assessed under Chapter 123 of Title 28, United States Code.  Administrative Claims also include Professional Charges (which, by definition, include only Allowed professional fees and expenses). Administrative Claims will be paid in full:  (i) on the Effective Date or Claim Payment Date, (ii) in the case of Professional Charges, within ten (10) Business Days of entry of a Final Order approving such charges, (iii) by any alternative arrangement agreed to by the Claim holder or ordered by the Bankruptcy Court, or (iv) in the case of post-petition operating expenses, in the ordinary course of the Debtor's businesses.

Priority Unsecured Claims include any Claim entitled to priority under Bankruptcy Code § 507 that is not an Administrative Claim, a Professional Charge, a Priority Tax Claim or a Priority Employee Unsecured Claim.  The Plan provides that Priority Unsecured Claims will be paid in Cash in full on the Claim Payment Date, or by any alternative arrangement agreed to by the Claim holder or ordered by the Bankruptcy Court.

Priority Tax Claims include all Unsecured Claims entitled to priority pursuant to Bankruptcy Code § 507(a)(8) and are provided the treatment authorized by Bankruptcy Code § 1129(a)(9)(C).

C.      **Classified Claims.**

1.      **Class 1 – Priority Employee Unsecured Claims (Unimpaired; Not Entitled to Vote; Deemed to Accept).**

(a)      **Definition.**  This Class is defined to include the Claims of the Debtor's employees for vacation and sick leave pay, which is entitled to priority under Bankruptcy Code § 507(a)(4)(A).

(b)      **Allowance and Treatment.**  Priority Employee Unsecured Claims will not be paid in Cash, but will instead be honored in the ordinary course in accordance with the Debtor's policies at the time the Claims mature.  These Claims are unimpaired and will be treated as Allowed; in other words, they will be paid in full under the Plan in accordance with the holders' existing contractual rights.

(c)      **Reservation of Rights.**  The Plan does not alter the Debtor's ability to review the policies and procedures regarding vacation and sick leave pay and to propose modifications to those policies and procedures to become a part of the Plan.  To the extent the Debtor proposes any changes to such policies and procedures that would be retroactive, the Debtor will modify the Plan to include such changes and give notice to the holders of any Priority Employee Unsecured Claims at least ten (10) days before the Confirmation Hearing.  In that event, the holders of the Priority Employee Unsecured Claims will be impaired and the Plan will be modified to so state.

2.      **Class 2 – Prepetition Date Secured Tax Claims (Impaired; Entitled to Vote).**

(a)      **Definition.**  Class 2 is defined to include the prorated portion of a Secured Tax Claim arising before and up to the Petition Date.  Secured Tax Claims include the Claims of any federal, state, or local governmental unit secured by Estate property by operation of applicable non-bankruptcy laws, including, but not limited to, unpaid real property taxes, unpaid personal property taxes, or unpaid sales taxes or leasing taxes, but only to the extent of the validity, perfection, and enforceability of the claimed lien or security interest.  As of the Petition Date, the Debtor is unaware of any Class 2 Claims.

(b)      **Allowance and Liquidation.**  Secured Tax Claims will be prorated depending on the date when the tax arises.  Taxes arising before the Petition Date will be treated under Class 2.  Secured Tax Claims arising after the Petition Date but before the Effective Date will be treated as unclassified Administrative Claims.  Secured Tax Claims that arise on or after the Effective Date will be paid in the ordinary course of business of the Reorganized Debtor.  Class 2 Claims may be determined by the Bankruptcy Court notwithstanding the existence of any appeals to state or local taxing authorities of property tax or assessment determinations on the Petition Date.

(c)      **Treatment.**  Allowed Class 2 Claims will bear interest from and after the Effective Date until they are paid in full at the rate of two percent (2%) per annum and will be paid in three (3) equal installments, with the first installment paid on the first Business Day that is ninety (90) days after the Effective Date or the Claim Payment Date, the second installment

paid on the first Business Day after the first anniversary of the Effective Date or the applicable Claim Payment Date, and the third and last installment paid on the first Business Day after the second anniversary of the Effective Date or the applicable Claim Payment Date. Each holder of an Allowed Class 2 Claim will retain its liens until its Claim is paid in accordance with the Plan.

**3.** **Class 3 – Unsecured Claim of Faricy (Impaired; Entitled to Vote).**

**(a)** **Definition.** This Class includes the Unsecured Claim of Faricy, which the Debtor disputes.

**(b)** **Allowance and Treatment.** Unless all holders of all Class 3 Claims elect on each of their Class 3 Ballots to be treated under Section 8.1 of the Plan, all Class 3 Claims will be treated as follows: All Class 3 Claims, as and when each is an Allowed Claim but only up to the maximum aggregate amount of $585,623.00, will be treated as a fully Unsecured Claim and will be paid in full and in Cash through equal monthly payments of no more than $4,000.00 each over sixty (60) months. Payments to the holders of Allowed Class 3 Claims, if any, will begin on the first Business Day following the sixth (6th) month after the later to occur of (i) the Effective Date, or (ii) the date such Class 3 Claim is Allowed. Subsequent payments will be made on the same day of the each month thereafter. After applying the monthly payments, the full amount remaining of any Allowed Class 3 Claim will be paid in full on the date that is sixty (60) months after the first monthly payment made on such Allowed Class 3 Claim. No interest or penalties will be payable on any Class 3 Claims. However, if (and only if) all holders of all Class 3 Claims each elect on each Class 3 Ballot to be treated under Section 8.2, all Class 3 Claims will be deemed Allowed Claims as of the Effective Date. On the Effective Date, the Class 3 Claims will receive a single, aggregate, lump sum payment of $300,000.00 in full satisfaction of all Class 3 Claims. If less than all holders of all Class 3 Claims elect to be treated under this Section 8.2 on each Class 3 Ballot, then all Class 3 Claims will be treated exclusively in accordance with Section 8.1 of the Plan. *The Reorganized Debtor will bear sole and complete responsibility for any payments made to Class 3 Claims as set forth in the Plan. Neither the Trustee nor the Trust will bear any obligation(s) to fund payments or otherwise with respect to the approved treatment of any Class 3 Claim, or with respect to the approved treatment of any Claim other than a Class 10 Claim, except the Trust will distribute amounts transferred by the Reorganized Debtor to fund specific Class 11 Claims, if any, in a manner consistent with the Trust Agreement and other provisions of this Plan.*

**4.** **Class 4 – US Bank PPP Loan Claim (Impaired; Entitled to Vote).**

**(a)** **Definition.** This Class contains all Claims related to the Debtor's PPP Loan. Currently, the amount of the Claim is $512,500.00, but the Debtor anticipates that all amounts will be forgiven in accordance with SBA regulations.

**(b)** **Treatment.** The US Bank PPP Loan Claim will either be forgiven in full or in part, or the Debtor will pay it in accordance with the PPP Loan Documents. If forgiven in full, the Debtor will not distribute any Assets under the Plan on account of the Class 4 Claim. If not forgiven, in whole or in part, the Debtor will make the required payments under the terms of the PPP Loan Documents and the SBA regulations then in effect. To the extent the SBA

regulations then in effect conflict with the PPP Loan Documents, the SBA regulations then in effect will control.

5.     <u>**Class 5 – Catholic Charities Claim (Impaired; Entitled to Vote).**</u>

(a)     <u>**Definition.**</u> This Class contains all Claims of Catholic Charities against the Debtor, including the prepetition Claims related to the Children's Home Property.

(b)     <u>**Treatment.**</u> This Claim will be treated solely in accordance with the Catholic Charities Settlement Agreement. The Claim will receive no distribution under the Plan.

6.     <u>**Class 6 – General Unsecured Convenience Claims (Impaired; Entitled to Vote).**</u>

(a)     <u>**Definition and Election.**</u> This Class includes all General Unsecured Claims that are in an amount less than $2,000.00, inclusive of interest; or into which holders of General Unsecured Claims in excess of $2,000.00 may elect to reduce their Claims to $2,000.00. Any general unsecured creditor may, through its Ballot, elect to waive its General Unsecured Claim, and instead obtain payment as a General Unsecured Convenience Claim holder.

(b)     <u>**Treatment.**</u> All Class 6 Claims that are in an amount less than $2,000.00, inclusive of interest, will be paid in full. All Class 6 Claims that resulted from the election of a holder of a General Unsecured Claim to be paid as a General Unsecured Convenience Claim will receive $2,000.00 total, without interest. Holders of Class 6 Claims, as and when Allowed, will be paid on the first Business Day that is six (6) months after the Effective Date or the Claim Payment Date.

7.     <u>**Class 7 – General Unsecured Claims (Impaired; Entitled to Vote).**</u>

(a)     <u>**Definition.**</u> Class 7 includes every Claim against the Debtor that (1) is not an unclassified Claim, and (2) is not classified in any other Class under the Plan (including, but not limited to, every Claim arising from the rejection of an Executory Contract, every Claim that is the undersecured portion of any Secured Claim, and every personal or bodily injury Claim that is not a Tort Claim).

(b)     <u>**Treatment.**</u> Each holder of a Class 7 General Unsecured Claim, as and when such General Unsecured Claim is or becomes an Allowed Claim, will be paid the principal amount of its Claim (without interest or penalties) in Cash in two (2) installments with the first installment to be paid on the first Business Day that is six (6) months after the Effective Date or the Claim Payment Date, and the next installment on the first Business Day that is twelve (12) months after the previous payment.

8.     <u>**Class 8 – Other Tort and Employee Claims (Impaired; Entitled to Vote).**</u>

(a)     <u>**Definition.**</u> Class 8 includes any and all Unsecured Claims against the Debtor for property damage, liability, or workers compensation, whether arising from tort,

contract, or workers compensation, for which there is insurance coverage or a self-insured retention, but excluding Tort Claims and any Claims of employees entitled to priority pursuant to Bankruptcy Code § 507.  As of the Petition Date, the Debtor does not believe any Class 8 Claims exist.

(b)      **Treatment.**  Each holder of a Class 8 Claim, as and when such Claim becomes an Allowed Claim, will be paid solely (without interest or penalties) from any insurance coverage applicable to such Other Tort and Employee Claim.  To the extent that such Claims may not be satisfied in full by the foregoing, then such Other Tort and Employee Claims, to the extent not so satisfied, will receive no distribution under the Plan.

### 9.      Class 9 – Annuity Claims (Unimpaired; Not Entitled to Vote).

(a)      **Definition.**  Class 9 includes any and all Claims against the Debtor arising under Annuity Agreements.

(b)      **Distribution.**  The legal, equitable, and contractual rights of each holder of a Class 9 Claim will be reinstated in full on the Effective Date.  The Reorganized Debtor, through Bremer Bank, will continue to pay the Annuity payments in accordance with the terms of the applicable Annuity Agreement.

### 10.      Class 10 - Tort Claims (Impaired; Entitled to Vote).

(a)      **Definition.**  Class 10 includes any and all Claims for damages, including punitive damages for attorneys' fees and other expenses, fees or costs for any equitable remedy asserted against the Debtor and any Protected Parties, related to bodily injuries or personal injuries arising from:

(i)      Acts of Abuse committed by any cleric, employee, volunteer, or other Person associated with the Debtor or any affiliated Entity within the territory of the Diocese; or

(ii)      The failure of the Debtor to properly hire, install, and/or supervise any cleric, any volunteer, or any other employee of, or Person associated with, the Debtor or any affiliated Entity within the territory of the Diocese; or

(iii)      The processing, adjustment, defense, settlement, payment, negotiation, or handling of any Claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Claims made as a result of any Abuse or other Tort Claim asserted by a Tort Claimant; or

(iv)      The failure to warn, disclose, or provide information concerning the Abuse or other misconduct of clergy, other employees or volunteers, or other persons associated with the Debtor or any affiliated Entity within the territory of the Diocese.

(b)      **Treatment.**  On the Effective Date, the Trust will assume all liability for and will pay all Class 10 Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, Tort Claims Allocation Protocol, and Trust Documents.  The

-24-

Tort Claimants shall have their Class 10 Claims treated pursuant to the Tort Claims Allocation Protocol attached to the Plan as Exhibit A and incorporated therein.  The Reorganized Debtor and the Protected Parties will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants.  **The right of any Tort Claimant to a trial by jury or otherwise against the Reorganized Debtor and any of the Protected Parties is waived and released upon the occurrence of the Effective Date, and the Tort Claim of a Tort Claimant will be solely determined by the Abuse Claims Reviewer in accordance with the Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust and/or Trust Assets.**

(c)    **Rights Against Co-Defendants.**  Nothing in the Plan is intended to affect, diminish or impair any Tort Claimant's rights against any Co-Defendant, joint tortfeasor, or other Person who is not otherwise a Protected Party.  Under no circumstances will the reservation of such Tort Claimant's rights against any Co-Defendant, joint tortfeasor, or other Person who is not otherwise a Protected Party impair the releases, discharge, or injunctions with respect to any Protected Party, against whom all such rights and/or Claims will be and are hereby enjoined as provided in Sections 26.5 of the Plan.

(d)    **Objections to Tort Claims.**  No Tort Claimant may challenge the merit, validity, or amount of any Class 10 Claim.  If any objection to a Class 10 Claim is pending as of the Effective Date, such objection is deemed withdrawn with prejudice on or after the Effective Date.  The Trustee shall have the sole and exclusive right to object to a Class 10 Claim.

(e)    **Release and Certification.**  No Tort Claimant will receive any payment on any Award unless and until such Tort Claimant has made the certifications set forth in the Class 10 Ballot and executed the release attached as Exhibit D to the Plan.  The release and certifications included in the Class 10 Ballot for voting on the Plan are sufficient for this purpose.  A Tort Claimant who does not timely submit a Ballot must personally execute the release and certifications required by Section 15.5 of the Plan.  Notwithstanding the foregoing, nothing in this Article requires any Class 10 claimant to release any Claim(s) against any joint tortfeasor or other Person who is not a Protected Party, and such Claim(s) are reserved. But in no event may a Class 10 claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties. Any Person that is, or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 10 Claim will be provided by the Trustee with a copy of the executed release upon reasonable request and provision of an appropriate, executed confidentiality agreement, and will not be liable for any Protected Parties' share of liability or fault. The release of these Class 10 Claims is pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Trust will be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request.

(f)    **Denial of Payment.**  If a Tort Claim is denied payment pursuant to the Tort Claims Allocation Protocol, the holder of such Tort Claim will nevertheless have no rights against the Protected Parties, the Trust, the Trustee, or the Reorganized Debtor arising out of, relating to, or in connection with such Tort Claim and such Tort Claim shall be a Disallowed Claim and shall be discharged and subject to the Channeling Injunctions as provided in the Plan.

-25-

(g)     **No Penalty Claims.**   Except for any payment that may be provided from the Trust as part of the Tort Claims Allocation Protocol, Penalty Claims relating to Tort Claims will receive no distribution and will be Disallowed Claims.

(h)     **Withdrawal of Tort Claim.**   A Tort Claimant may withdraw a Tort Claim at any time, without further order of the Court, on written notice to the Trustee.  If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted against the Reorganized Debtor, the Trust, the Trustee, or any Protected Party, including as an Unknown Tort Claim, and (b) as a condition to withdrawal of the Tort Claim, any funds paid to the Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust. Withdrawal of any Tort Claim by a Tort Claimant shall be without prejudice to such Person's rights against any Co-Defendant, joint tortfeasor, or other Person who is not a Protected Party, subject to the limitations contained in the Plan and the Confirmation Order.

## 11.     Class 11 – Unknown Tort Claims (Impaired; Entitled to Vote).

(a)     **Definition.**   Class 11 includes any Tort Claim for which no Proof of Claim is filed or deemed filed on or before the Proof of Claim Deadline by a Tort Claimant (as opposed to the Proof of Claim filed by the Unknown Claims Representative) or for which a Proof of Claim is filed after the Proof of Claim Deadline if the Person asserting the Tort Claim:

(i)     Has a Tort Claim that was barred by the applicable statute of limitations as of the Proof of Claim Deadline but is no longer barred by the applicable statute of limitations for any reason, including for example the passage of legislation that revives such previously time-barred Tort Claims; or

(ii)     Turns 18 on or after the date which is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Case; or

(iii)     If the Minnesota statute of limitations for Abuse Claims, for any reason, has not expired or has been tolled as of the date that is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Case, as determined under Minnesota federal law, but without regard to federal bankruptcy law; and

(iv)     Submits a Proof of Claim in accordance with the procedures set forth in the Plan.

(b)     **Treatment.**   On the Effective Date, the Trust will assume all liability for and pay all Unknown Tort Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, the Unknown Tort Claims Allocation Protocol, and Trust Documents.  From and after the Effective Date, neither the Reorganized Debtor nor any of the other Protected Parties will have any liability for any Unknown Tort Claims, except for funding the Unknown Tort Claims Obligation.  Unknown Tort Claimants shall have their Class 11 Claims treated pursuant to the Unknown Tort Claims Allocation Protocol, including review of such Claims by the Abuse Claims Reviewer in accordance with the Unknown Tort Claims Allocation Protocol, the Plan, and the Plan Documents.  **The right of any Unknown Tort Claimant to a trial by jury or otherwise against the Reorganized Debtor, and any of the Protected Parties is waived and released upon occurrence of the Effective Date, and the Tort Claim of an Unknown Tort**

QB\65418958.1

**Claimant will be solely determined by the Abuse Claims Reviewer and in accordance with the Unknown Tort Claims Allocation Protocol.**

(c)      **Unknown Tort Claims Obligation.**  After the Effective Date, the Reorganized Debtor will be responsible for funding distributions to the Trustee for the benefit of Unknown Tort Claimants who are entitled to an Award pursuant to the Plan and Plan Documents, as follows:

(i)      **Funding Obligation Amount Limit**.    During the Unknown Tort Claims Funding Period (defined below), the Reorganized Debtor will fund distributions to the Trustee for the benefit of Unknown Tort Claimants on an "as-needed" basis as provided in Section 16.3 of the Plan; *provided, however, that* the aggregate maximum amount the Reorganized Debtor is obligated to fund to the Trustee for the benefit of Unknown Tort Claimants will not exceed the lesser of:  (i) the aggregate amount of all Awards to Unknown Tort Claimants finally determined in accordance with the Plan and Plan Documents, or (ii) $500,000.00.  For the avoidance of doubt, the Reorganized Debtor is not obligated to fund to the Trustee for the benefit of Unknown Tort Claimants more than $500,000.00 under any circumstances, and the Unknown Tort Claimants, collectively, cannot collect more than $500,000.00.  The Reorganized Debtor will provide the funds required under Section 16.2 of the Plan to the Trustee for the benefit of Unknown Tort Claimants in accordance with Section 16.3 of the Plan and applicable Plan Documents.  Under no circumstances, will the Reorganized Debtor pay an Unknown Tort Claimant's Award directly to an Unknown Tort Claimant.

(ii)      **Funding Obligation Time Limit**.    The Reorganized Debtor's obligation to fund distributions to the Trustee for the benefit of Unknown Tort Claimants will terminate automatically on the date that is forty-two (42) months following the Effective Date (the "**Funding Period**"), regardless of the amount that the Reorganized Debtor has then funded to the Trustee for the benefit of Unknown Tort Claimants; *provided, however, that*, if, prior to expiration of the Funding Period, an Unknown Tort Claim has been submitted to the Abuse Claims Reviewer in accordance with Section 16.3.1 of the Plan and the Unknown Tort Claims Allocation Protocol, then the Reorganized Debtor's obligation to fund distributions to the Trustee for the benefit of Unknown Tort Claimants will automatically be extended to the date that is sixty (60) months following the Effective Date (the "**Extended Funding Period**").  The Funding Period and the Extended Funding Period, as applicable, will be referred to in this Plan as the "**Unknown Tort Claims Funding Period**".  The Reorganized Debtor's obligation to fund distributions to the Trustee for the benefit of Unknown Tort Claimants will terminate automatically upon expiration of the Unknown Tort Claims Funding Period, regardless of the amount that the Reorganized Debtor has then funded to the Trustee for the benefit of Unknown Tort Claimants.

(d)      **Rights Against Co-Defendants.**  Nothing in the Plan is intended to affect, diminish or impair any Unknown Tort Claimant's rights against any Co-Defendant, joint tortfeasor, or other Person who is not otherwise a Protected Party.  Under no circumstances will the reservation of such Unknown Tort Claimant's rights against any Co-Defendant, joint tortfeasor, or other Person who is not otherwise a Protected Party impair the releases, discharge, or injunctions with respect to any Protected Party against whom all such rights and/or Claims will be and are hereby released and enjoined as provided in Sections 26.5 of the Plan.

QB\65418958.1

(e)      **Release and Certification.**  No Unknown Tort Claimant will receive any payment from the Trust unless and until the Unknown Tort Claimant has personally made the same certifications set forth in the Class 10 Ballot and executed the release attach as Exhibit D to the Plan.  The release and certifications included in the Class 10 Ballot for voting on the Plan are sufficient for this purpose.  Any Person or Entity that is or was alleged to be a joint tortfeasor with the Debtor in connection with any Tort Claim or Unknown Tort Claim will not be liable for the Debtor's share of liability or fault for such Claim.  Notwithstanding the foregoing, nothing in this Article requires any Class 11 claimant to release any Claim(s) against any joint tortfeasor or other Person who is not a Protected Party, and such Claim(s) are reserved.  But in no event may a Class 11 claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties.  Any Person that is, or was alleged to be, a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 11 Claim will be provided by the Trustee with a copy of the executed release upon reasonable request and provision of an appropriate, executed confidentiality agreement, and will not be liable for any Protected Parties' share of liability or fault.  The release of these Class 11 Claims is pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978).  The Trust will be obligated to provide copies of the Unknown Tort Claimants' releases and certifications to any of the Protected Parties upon request.

(f)      **Objections.**  The Trustee shall have the sole and exclusive right to object to an Unknown Tort Claim.

(g)      **Disallowed Unknown Tort Claims.**  If a Class 11 Claim is Disallowed or denied payment pursuant to the Unknown Tort Claims Allocation Protocol, the holder of such Unknown Tort Claim will have no further rights against the Protected Parties, the Reorganized Debtor, the Trust, or the Trustee arising out of, relating to, or in connection with such Unknown Tort Claim and such Unknown Tort Claim shall be a Disallowed Claim and shall be discharged and subject to the Channeling Injunction as provided in the Plan.

(h)      **Unknown Tort Claimants' Fees and Costs.**  The fees and expenses of attorneys representing Unknown Tort Claimants who receive payment from the Trust will be borne by such Unknown Tort Claimants based on applicable state law and individual arrangements made between such Unknown Tort Claimants and their respective attorneys.  None of the Reorganized Debtor, the Trust, the Trustee, or the Protected Parties will have any liability for any fees and expenses of attorneys representing any Unknown Tort Claimants and any Claims for such fees and expenses will be Disallowed.

(i)      **No Penalty Claims.**  Except for any payment that may be provided from the Trust as part of the Unknown Tort Claims Allocation Protocol, Penalty Claims relating to Unknown Tort Claims will receive no distribution and will be Disallowed Claims.

(j)      **Withdrawal of Unknown Tort Claims.**  An Unknown Tort Claimant may withdraw an Unknown Tort Claim at any time, without further order of the Court, on written notice to the Trustee.  If withdrawn, (a) the Unknown Tort Claim will be withdrawn with prejudice and may not be reasserted against the Reorganized Debtor, the Trustee, the Trust, or any Protected Party; and (b) as a condition to withdrawal of the Unknown Tort Claim, any funds

-28-

paid to the Unknown Tort Claimant by the Trust shall be returned to the Trust. Withdrawal of any Unknown Tort Claim by an Unknown Tort Claimant shall be without prejudice to such Person's rights against any Co-Defendant, joint tortfeasor, or other Person who is not a Protected Party, subject to the limitations contained in the Plan and the Confirmation Order.

>    **12.**    **Class 12 – Co-Defendant and Parish Claims (Impaired; Not Entitled to Vote—Deemed to Reject).**

>    **(a)**    **Definition.**  Class 12 includes any Claims of any Parishes and Co-Defendants.  The Plan defines Co-Defendants to include Entities that have brought third-party claims or cross-claims against the Debtor or who are otherwise alleged to be fully or partially responsible for a Tort Claim, including an Unknown Tort Claim asserted, or that may be asserted in the future, against such Entity.

>    **(b)**    **Treatment.**  All Class 12 Claims will be Disallowed Claims and there will be no distribution to the holders of any Class 12 Claims.

>    **13.**    **Class 13 - Insurance and Benefit Claims (Unimpaired; Not Entitled to Vote).**

>    **(a)**    **Definition.**  Class 13 includes all Insurance and Benefits Claims, which the Plan defines to include any Unsecured Claim arising from or related to obligations, contributions, or benefits of the Debtor pursuant to any pension or other benefit plan sponsored by the Debtor or for which the Debtor is otherwise obligated.

>    **(b)**    **Treatment.**  The Class 13 Claims will be treated and satisfied by the Reorganized Debtor in accordance with the past practices and policies of the Debtor.  Unless otherwise provided or required pursuant to the practices and policies of the Debtor, no interest will accrue or be paid on any Insurance and Benefit Claims.

>    **14.**    **Class 14 – Penalty Claims (Impaired; Not Entitled to Vote—Deemed to Reject).**

>    **(a)**    **Definition.**  Class 14 includes any Claims for any fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages, including, but not limited to, any such Claims not meant to compensate the claimant for actual pecuniary loss, and including, but not limited to, any Claims created by the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.*, and related regulations.

>    **(b)**    **Treatment.**  No Penalty Claims will be Allowed.  All Penalty Claims will be Disallowed Claims, and there will be no distribution to the holders of any Penalty Claims.

QB\65418958.1

## IX.    MEANS FOR PLAN IMPLEMENTATION.

### A.    Establishment of Trust Account.

After the Confirmation Date, the Trustee will establish the Trust Account, which will be held and administered in accordance with the Plan, Trust Agreement, and the Confirmation Order. The Trust Account will include the following:

**1.    Funding the Trust.**  On the Effective Date, the Reorganized Debtor will transfer the following to the Trust:

**(a)**    TWENTY-TWO MILLION FIVE HUNDRED THOUSAND DOLLARS and no/100 ($22,500,000.00), *less* any amount required to fund the Administrative Claims Reserve for the limited purpose of funding Allowed Professional Charges that exceed $500,000.00 in the aggregate, as set forth in <u>Section 20.3</u> of the Plan.  The $22.5 million will be raised from amounts in the U.S. Bank settlement account, property sales and/or post-petition loans, and approximately $1.7 to $2 million from certain Parishes;

**(b)**    Any and all Other Insurer Claims. (The Debtor does not believe such Other Insurer Claims exist).  The following provision will apply to the Other Insurer Claims:

**(i)**    The Reorganized Debtor's transfer of Other Insurer Claims to the Trust is without representation or warranty (express or implied) of any kind, including, without limitation, that such Other Insurer Claims exist or have any value.  The Trust bears all risks of collection with respect to such Other Insurer Claims (if any);

**(ii)**    According to the Debtor, it has produced all information it in its possession regarding the existence (or lack thereof) of Other Insurers; the Reorganized Debtor will have no further duty to investigate, produce, or otherwise provide information to the Trust regarding any Other Insurers or Other Insurer Claims;

**(iii)**    To the extent the Trust or any assignee asserts an Other Insurer Claim against an Other Insurer, the Reorganized Debtor will not be compelled (by the Trust or otherwise) to participate in prosecution of such Other Insurer Claim, except to the extent required to comply with any duty of cooperation the Reorganized Debtor may have, or otherwise preserve any insurance coverage.  To the extent the Reorganized Debtor's participation in such prosecution is sought by any court or Person, the Trust (at its own cost) will defend any such proceeding to the full extent permitted by law, or otherwise fund the cost of compliance if necessary to preserve any insurance coverage as set forth in Section 22.2.2(d);

**(iv)**    The Trust will reimburse both the Reorganized Debtor and Catholic Mutual for all reasonable and necessary fees and costs it may incur in connection with any prosecution of an Other Insurer Claim.  Before the Trust can pursue an Other Insurer Claim, it must reserve no less than $75,000.00 for the Reorganized Debtor and $75,000.00 for Catholic Mutual (for a total reserve amount of $150,000.00) to cover such reimbursement obligations; *provided, however,* that the Trust's obligation to reimburse the Reorganized Debtor and/or Catholic Mutual under this subsection is not limited to such parties' respective reserve amounts.  To the extent either the Reorganized Debtor's or Catholic Mutual's reasonable and

necessary fees and costs exceed $75,000.00, the Trust will reimburse the Reorganized Debtor or Catholic Mutual, or both, for all such fees and costs incurred in connection with the Trust's pursuit of an Other Insurer Claim from whatever Trust assets are or become available; and

(v)     The Trust's right to commence collection of any Other Insurer Claim will automatically terminate on the date that is sixty (60) months following the Effective Date.

**B.     Establishment of Administrative Claims Reserve.**

The Reorganized Debtor will establish the Administrative Claim Reserve, which may be held in any of the Reorganized Debtor's existing bank accounts or a new account, in the Reorganized Debtor's sole discretion, and which will be treated as restricted funds. The amount of the Administrative Claim Reserve will be equal to the estimated amount of all Administrative Claims (including Professional Charges) that are predicted to become Allowed on and after the Effective Date. The amount of the Administrative Claim Reserve will be fixed by agreement between the Committee and the Debtor; or, if the Committee and the Debtor cannot agree, by the Bankruptcy Court. The Administrative Claim Reserve will be funded from the following sources: (i) the Reorganized Debtor's Assets, excluding the funds to be transferred into the Trust Account, as required by Section 20.2 of the Plan, but only up to the maximum aggregate amount of $500,000.00; and (ii) to the extent that Allowed Professional Charges exceed $500,000.00 in the aggregate, a portion of the Plan funding that will be held back by the Reorganized Debtor at the time the Debtor transfers its portion of the Plan funding into the Trust Account as required by Section 20.2 of the Plan. Any amounts held back from funding to the Trust as part of the Administrative Claims Reserve that are not ultimately paid on account of Professional Charges that exceed $500,000.00 in the aggregate will be remitted to the Trustee within ten (10) calendar days after entry of all orders on final fee applications for Professional Charges incurred during the period prior to the Effective Date. For the avoidance of doubt, the Debtor is obligated to pay the first $500,000.00 in Professional Charges from Assets separate from the $22,500,000.00 referenced in Section 20.2 of the Plan.

**C.     Unknown Tort Claims Obligation.**

After the Effective Date, the Reorganized Debtor will be responsible for funding the Unknown Tort Claims Obligation, as provided in Sections 16.2 and 16.3 of the Plan.

**D.     Payment and Treatment of Claims Other Than Tort Claims and Unknown Tort Claims.**

Payments due to creditors on account of Allowed Claims other than Tort Claims or Unknown Tort Claims will be paid pursuant to the terms of the Plan from the Reorganized Debtor's Revested Assets and ongoing operations. Payments for Allowed Professional Charges will be paid as Final Orders are entered allowing them from the Administrative Claims Reserve and, if necessary, other Assets.

### E.     **Retained Claims.**

On or before the Effective Date, all Retained Claims will be assigned by the Debtor to the Reorganized Debtor.  The Reorganized Debtor may pursue any Retained Claims at its discretion and will retain the proceeds of all such Retained Claims pursued, if any.

### F.     **Other Approvals.**

Any approvals required to approve a source of funding for the Plan that has not been previously approved by the Bankruptcy Court through a Final Order, will be submitted and approved as part of the Confirmation Order.  The entry of the Confirmation Order may constitute the Final Order approving any Plan funding transactions.

### G.     **Settlements.**

Pursuant to Bankruptcy Code § 105, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims against the Debtor in consideration for the classification, distributions, and other benefits provided under the Plan including the commitment by the Debtor to fund the Debtor's obligations under the Plan, the Parishes Agreement, the Catholic Charities Settlement, and the contribution of any other Protected Party.  On or before the Effective Date, the Bankruptcy Court will have approved, by Final Order, such compromises and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, the Tort Claimants, the Unknown Tort Claimants, holders of other Claims, and other parties in interest, and are fair, equitable, and within the range of reasonableness.  To the extent a separate Final Order is not entered by the Confirmation Date, the entry of the Confirmation Order will constitute the Final Order approving the compromises and settlements.

### H.     **Non-Monetary Commitment to Healing and Reconciliation**.

In order to further promote healing and reconciliation, and in order to continue its efforts to prevent Abuse from occurring within the territory of the Diocese in the future, the Reorganized Debtor agrees that beginning within thirty (30) days after the Effective Date (unless a different date is provided below), it will undertake the commitments set forth in Exhibit F to the Plan.

## X.     **CONDITIONS PRECEDENT TO EFFECTIVE DATE.**

### A.     **Conditions Precedent.**

The Effective Date will occur when each of the following conditions have been satisfied or waived by the Debtor in accordance with Article 25 of the Plan:

     **1.**     The Bankruptcy Court has entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor and the Committee; and the Confirmation Order is a Final Order;

     **2.**     The Trustee and the Debtor have executed the Trust Agreement;

    3.       The Trustee has opened the Trust Account; and

    4.       The Administrative Claim Reserve account has been established.

## B.    Waiver of Conditions.

Any condition set forth in Section 25.1 of the Plan may be waived by the mutual written consent of the Debtor and the Committee.

## C.    Closing.

Closing will be conducted at such location designated by the Debtor and the Committee, as soon as reasonably practicable following the Effective Date, at which time the Reorganized Debtor will execute and deliver the Plan Documents and complete those actions necessary for the Reorganized Debtor to establish and fund the Trust and make other distributions required to be made upon, or promptly following, the Effective Date. The Closing may be conducted remotely via electronic signatures. As soon as practicable after conditions set forth in Section 25.1 have been satisfied or waived in accordance with Section 25.2, the Trustee will file a notice of the Closing and the Reorganized Debtor will file a notice of the occurrence of the Effective Date.

## D.    Implications of Effective Date.

The Effective Date will occur on the first Business Day after the conditions to effectiveness stated in the Plan have been satisfied, unless the Confirmation Order is stayed by an order of the Bankruptcy Court, the District Court, or another appellate court. Nothing in the Plan precludes the date by which the Effective Date has to occur from being extended by agreement between the Committee and the Debtor, although there is no requirement that either the Committee or the Debtor agree to any such extension.

The Effective Date triggers certain injunctions and releases under the Plan, and also the Debtor's discharges, which are explained in detail in Article XV below. As of the Effective Date, the Trust will have assumed all liability for Tort Claims and Unknown Tort Claims consistent with the provisions of the Plan and Trust Agreement. The Effective Date also triggers many of the obligations of the parties under the Plan, including funding the Plan and payment of certain Claims. However, the Effective Date may occur before all Claims have been Allowed by the Bankruptcy Court and may occur before all Tort Claims have been determined under the Tort Claims Allocation Protocol. Accordingly, in the description of the treatment of Claims in this Disclosure Statement and in the Plan, the payment of Claims is, in some cases, triggered by the Claim Payment Date, which is defined in the Plan as the later of the Effective Date or the first Business Day ten (10) days after a Claim becomes an Allowed Claim by a Final Order. Payment of Tort Claims and Unknown Tort Claims shall be governed by the Allocation Protocols attached to the Plan as Exhibits A and B and incorporated therein.

## E.    Non-Occurrence of Effective Date.

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within ninety (90) days of entry of the Confirmation Order (as a Final Order), the Plan

QB\65418958.1

will become null and void unless agreed otherwise by the Debtor and the Committee. A statement will be filed with the Court within three (3) Business Days after the occurrence of any event that renders the Plan null and void.

## XI.  REORGANIZATION OF DEBTOR AND POST-CONFIRMATION MANAGEMENT.

### A.  Continuing Existence.

The Debtor will, as Reorganized Debtor, continue to exist after the Effective Date as a legal entity, with all powers of a religious corporation under the laws of the State of Minnesota without prejudice to any right to alter or terminate such existence under applicable state law but subject to applicable Canon Law.

On and after the Effective Date, the Reorganized Debtor and the Diocese may operate their respective businesses and carry on the ministry and the mission of the Roman Catholic Church and may use, acquire, or dispose of property, and compromise or settle any Claims without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

On and after the Effective Date, the Reorganized Debtor may operate its business and carry on the ministry and the mission of the Diocese and may use, acquire, or dispose of property, and compromise or settle any Claims without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

The Reorganized Debtor will continue to be managed in accordance with the principles of Canon Law and applicable state law. Bishop Kettler will continue in his role as President of the Debtor, and the pre-petition directors of the Debtor will continue in their roles as directors of the Reorganized Debtor.

The Committee will designate the person who shall serve as the Trustee. The proposed Trustee's curriculum vitae will be filed with the Court, along with a proposal from the Trustee with respect to his or her service as the Trustee, including proposed fees with respect to his or her service.

## XII.  POST-EFFECTIVE DATE EVENTS AND PERFORMANCE BY THE REORGANIZED DEBTOR.

### A.  Post-Effective Date Obligations.

Post-Effective Date, the Reorganized Debtor will perform all of its obligations under the Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

B.    **Post-Effective Date Funding.**

The funds necessary to ensure continuing performance under the Plan after the Effective Date will be (or may be) obtained from:

1.    Liquidation or financing of any and all Revested Assets;

2.    Cash generated by the post-Effective Date operations of the Reorganized Debtor; and

3.    Any reserves established by the Debtor or the Reorganized Debtor; *provided, however, that* no part of the Trust may be used to pay creditors other than Tort Claimants, Unknown Tort Claimants, and any Trust expenses designated under the Trust Agreement or Plan, and only those Assets to be paid or contributed to the Trust, pursuant to the Plan, will be used to pay the Allowed Claims of Tort Claimants and Unknown Tort Claimants and Trust expenses designated under the Trust Agreement.

The projections showing the ability of the Reorganized Debtor to meet its post-Effective Date obligations under the Plan are attached hereto as **Exhibit 2**.

C.    **Dissolution of Committee.**

The Committee will be dissolved upon occurrence of the Effective Date; *provided, however, that* the Committee may continue to exist after the Effective Date with respect to any and all applications for Professional Charges but not for any other purpose.

D.    **Final Decree.**

As soon as practicable after the Effective Date, when the Reorganized Debtor deems appropriate, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Reorganization Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; *provided, however, that* entry of a final decree closing the Reorganization Case will, whether or not specified therein, be without prejudice to the right of the Reorganized Debtor, the Trustee, or any other party in interest to reopen the Reorganization Case for any matter over which the Bankruptcy Court or the U.S. District Court for the District of Minnesota has retained jurisdiction under the Plan.  Any order closing this Reorganization Case will provide that the Bankruptcy Court or the U.S. District Court for the District of Minnesota, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in the Reorganization Case, and the obligations created by the Plan and the Plan Documents; (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents; and (c) provide that the Trust may be terminated and the Trustee discharged as ordered by the Bankruptcy Court without reopening any of the Reorganization Case.

E.    **United States Trustee Obligations.**

All fees payable pursuant to 28 U.S.C. § 1930 as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and,

-35-

thereafter, in accordance with applicable bankruptcy law.  All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

### F.    Non-Tort Claims Review, Allowance, and Payment.

Except for Tort Claimants and Unknown Tort Claimants, any Entity to whom the Debtor has incurred an obligation (whether on account of the provision of goods, services or otherwise), or who has received goods or services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor, subsequent to the Effective Date, and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a Proof of Claim against the Debtor in these Reorganization Case; (ii) such Entity's Proof of Claim has been objected to; (iii) such Entity's Claim was included in the Schedules; or (iv) such Entity's scheduled Claims have been objected to or have been identified as disputed, Contingent, or unliquidated.

The following procedures will be used solely for purposes of allowance and disallowance of Non-Tort Claims:

### 1.    Objections to Claims.  Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed prior to the Effective Date, all objections to Claims must be filed by the Claim Objection Deadline; *provided*, *however*, *that* nothing contained in the Plan will affect the Debtor's right to seek estimation of any Non-Tort Claims on any grounds permitted by the Bankruptcy Code at any time.

### 2.    Disputed Claims.  No payments or other distributions will be made to the holders of Disputed Claims unless and until such Claims are Allowed Claims pursuant to a Final Order.  If a Disputed Claim is not an Allowed Claim by the Effective Date, or when payment is otherwise due under the Plan, payment on the Allowed Claim (plus interest, if any is provided for in the Plan) will commence on the Claim Payment Date.

### 3.    Treatment of Contingent Claims.  Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is a Disallowed Claim, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.  The holder of a Contingent Claim will only be entitled to a distribution under the Plan when and if such Contingent Claim becomes an Allowed Claim, subject, however, to the provisions of Bankruptcy Code § 502(e), and, provided that if such Contingent Claim is for reimbursement, indemnification or contribution at the time of allowance or disallowance, it will be a Disallowed Claim pursuant to Bankruptcy Code § 502(e)(1)(B).

### G.    Payments Effective Upon Tender.

Whenever the Plan requires payment to be made, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment is due.  If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending

final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights that would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

**H.**     **Preservation of Debtor's Claims, Demands, and Causes of Action.**

Except as otherwise expressly provided in the Plan, all Claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtor and/or the Estate against any other Entity, including but not limited to, the Retained Claims arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, are hereby preserved in full for the benefit of the Reorganized Debtor.  The Debtor or the Reorganized Debtor will have the exclusive right, authority and discretion to enforce the Claims, demands, and causes of action of any kind or nature, including the Retained Claims, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, a bankruptcy court adversary proceeding filed in the Reorganization Case.  The Debtor or the Reorganized Debtor will also have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, demands, and causes of action of any kind or nature, including the Retained Claims, without obtaining Bankruptcy Court approval.  To the extent necessary, the Reorganized Debtor is hereby designated as the representative of the Estate pursuant to, and in accordance with, Bankruptcy Code § 1123(b)(3)(B).  The Debtor and the Reorganized Debtor will also be entitled to assign their rights under the Plan (except to as to any Claims, causes of action, cross-claims and counterclaims that are to be released pursuant to the Plan).  On the Effective Date, and except as otherwise specifically provided in the Plan, including but not limited to with respect to Retained Claims that are specifically retained by the Debtor and assigned to the Reorganized Debtor, the Trustee is hereby designated as the representative of the Estate, pursuant to and in accordance with, Bankruptcy Code § 1123(b)(3) with respect to any and all Claims, defenses, counterclaims, setoffs, and recoupments belonging to the Debtor or its Estate with respect to Tort Claims and Unknown Tort Claims.

**I.**     **Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses with respect to any unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, such unimpaired Claims.

**J.**     **Operative Documents.**

The Debtor or the Committee will prepare any documents that the Debtor, the Reorganized Debtor, or the Committee deem necessary or appropriate to execute the Plan or are provided for under the Plan, including, but not limited to, the Plan Documents.  If there is any dispute regarding the reasonableness or propriety of any such documents after reasonable and good faith efforts to negotiate and obtain approval of the documents by the affected Entity, any such dispute will be

QB\65418958.1

presented to the Bankruptcy Court for determination, at or in conjunction with the Confirmation Hearing.

**K. Return of Deposits.**

To the extent that the Debtor was required to and did pay deposits to any creditors before or after the Petition Date, as a condition of or as security for continued service after the Petition Date, including, but not limited to, deposits paid to utility companies for adequate assurance pursuant to Bankruptcy Code § 366, then, upon satisfaction of the Claims of such creditor pursuant to the Plan or if such creditor did not have any Claims against the Debtor, any such deposits, together with any interest or other income earned thereon, if any, will be refunded to the Reorganized Debtor within fifteen (15) days of demand for return of such deposit.

**L. Delivery of Distributions (Except to Holders of Tort Claims and Unknown Tort Claims).**

Distributions will be made by the Debtor or the Reorganized Debtor to holders of Non-Tort Claims as follows:

**1.** At the addresses set forth in the Proofs of Claim (and if both a claimant's address and a claimant's counsel are listed on the Proof of Claim then to counsel's address) filed by holders of Claims or the last known addresses of such holders if no Proof of Claim is filed or if the Debtor or the Reorganized Debtor has not been notified of a change of address;

**2.** At the addresses set forth in written notices of address change delivered to the Debtor or the Reorganized Debtor after the date of any related Proof of Claim; or

**3.** At the addresses reflected in the Schedules filed in the Reorganization Case if no Proof of Claim has been filed and the Claim is or becomes an Allowed Claim, and the Debtor or the Reorganized Debtor (as applicable) has not received a written notice of change of address.

**M. Transmittal of Distributions to Tort Claimants and Unknown Tort Claimants.**

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, distributions to Tort Claimants and Unknown Tort Claimants will be made by the Trustee and distributions to all other creditors will be made by the Reorganized Debtor. Distributions to Tort Claimants and Unknown Tort Claimants will be made in accordance with the Trust Documents.

**N. Absence of Address or Returned Mail.**

If a claimant's distribution is not mailed or is mailed but returned to the Reorganized Debtor or Trustee because of the absence of a proper mailing address, the Reorganized Debtor or Trustee, as the case may be, will make a reasonable effort to locate or ascertain the correct mailing address for such claimant from information generally available to the public and from such party's own records, but the Reorganized Debtor and the Trustee will not be liable to such claimant for

QB\65418958.1

having failed to find a correct mailing address. The Trustee will have no liability to a Tort Claimant on account of distributions made to the client trust account of a Tort Claimant's attorney.

### O.      Continuation of Current Insurance and Benefits Coverage.

Except as expressly set forth in the Plan, the Plan and Confirmation Order will have no effect on any insurance or benefits coverage under any certificates or policies issued to the Debtor that are in effect on the Effective Date and not otherwise released or sold pursuant to the Plan.

## XIII.   THE TRUST AND LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT CLAIMS.

### A.      Claim Payments.

Tort Claims and Unknown Tort Claims will be liquidated and paid in accordance with the Plan, the Confirmation Order, the Plan Documents, the Trust Documents, and the applicable Allocation Protocol. Any payment on a Tort Claim or Unknown Tort Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended (the "**Tax Code**").

### B.      No Execution.

All property transferred to the Trust will remain property of the Trust until such time as the property actually has been paid to and received by an Entity entitled to receive payment pursuant to the terms of the Plan, Plan Documents, Confirmation Order, and Trust Documents. Except as expressly provided in the Plan, Plan Documents, Confirmation Order, and the Trust Documents, the Trust is not responsible for administration of payment of any Claims against the Debtor other than Tort Claims or Unknown Tort Claims.

### C.      Special Provisions Relating to Tort Claims and Unknown Tort Claims.

**1.      Medicare and Medicaid-Related Provisions.** Pursuant to Section 111 of the MMSEA (42 U.S.C.A. § 1395y(b)(8)) and the MTPL, the Trust will be the applicable plan from which any Tort Claimants who might also be Medicare or Medicaid Beneficiaries receive payment on account of their Tort Claims. All payment obligations to a Tort Claimant will be funded from the assets of the Trust. The Trustee is the RRE as that term is defined in the Plan and under in Section 111 of the MMSEA, and the Confirmation Order will so provide.

**2.      Medicare and Medicaid-Related Obligations.** In addition to the foregoing obligations, the Trustee is the RRE with responsibility to ensure fulfillment of the reporting, notice, and reimbursement requirements, if any, pursuant to the MSPA, the MTPL, and Section 111 of the MMSEA and any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith.

**(a)**      On or after the date that the Confirmation Order becomes a Final Order, to the extent not already reliably accomplished by authorized representative(s) of a Post-

1980 Claimant (as defined below), the Trustee must determine, for any Tort Claimant whose Claim, including a Proof of Claim, complaint (if one has been served or filed), or other documentation offered in support of that Claim, potentially alleges or indicates that he or she was or may have suffered Abuse after December 5, 1980 (a "**Post-1980 Claimant**"), by query to CMS: (i) whether that Post-1980 Claimant is Medicare or Medicaid Eligible and, if so, (ii) whether he or she has received any Conditional Payment or otherwise subject to Medicare or Medicaid's right to subrogation arising from or relating to treatment for Abuse.  The Trustee will initiate such queries as soon as practicable, including prior to the Effective Date.

      **(b)**    If the Trustee, or authorized representative(s) of a Post-1980 Claimant, does not receive a response from CMS or the Minnesota's state Medicaid program (including a response from a query that an insurer or Tort Claimant's counsel has initiated) within seventy-five (75) days of the date on which the relevant query was submitted as to whether a Post-1980 Claimant is Medicare eligible and/or has received one or more Conditional Payments, then that Claimant may, in lieu of the query response from the relevant agency, certify in writing to the Trustee that he or she (i) is not Medicare or Medicaid eligible and (ii) that he or she will provide for payment and/or resolution of any future obligations owing or potentially owing under the MSPA or the MTPL.

      **(c)**    Prior to issuing a payment to any Post-1980 Claimant who is Medicare or Medicaid eligible, the Trust and Trustee will require that Tort Claimant's counsel hold in escrow an amount equal to the lesser of (1) the amount of the potential payment to the Tort Claimant or (2) the amount of any Medicare Conditional Payments, including Conditional Payments issued by any MAO, or payments subject to subrogation rights of Medicare or Medicaid, including payments issued by any MCO.  Such amount must be held in escrow until such time that Tort Claimant's counsel or the Trustee's professionals have provided written documentation from Medicare, including any MAO, and Medicaid, including any MCO, demonstrating that such Conditional Payments or payments subject to subrogation rights of Medicare or Medicaid have been satisfied, waived or otherwise released.

      **(d)**    If a portion of the settlement amount is paid to any Post-1980 Claimant who is identified as Medicare or Medicaid eligible, the Trust will report such payments to Medicare in accordance with the MMSEA or Medicaid in accordance with the MTPL, as applicable.

      **(e)**    The Trust must defend, indemnify, and hold harmless the Reorganized Debtor and the Protected Parties from any Claims related to Medicare or Medicaid Claims reporting, notice, and payment obligations, whether relating to past Conditional Payments made, payments subject to subrogation rights of Medicare or Medicaid, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA, MTPL, or MSPA, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents.  The Trust will not create a reserve for this potential obligation.

      **(f)**    Subject to the provisions of the Plan and the Trust Agreement, the Trust Assets will also be used for payment of indemnity and expenses related to reimbursing the United States government, Minnesota, or their contractors for Conditional Payments made or

-40-

otherwise subject to Medicare's or Medicaid's right to subrogation pursuant to the MSPA or the MTPL applicable to any given Medicare or Medicaid Beneficiary, Tort Claimants, and Unknown Tort Claimants.  None of the Protected Parties are obligated to make any other payments for this purpose, including any payments to the Trust.

### D.    Termination.

The Trust will terminate and the Trustee will have no further obligations under the Plan or the Trust Agreement as provided in the Trust Agreement.

### E.    No Liability for Costs.

Nothing in the Trust Documents will (i) impose any costs, directly or indirectly, upon the Estate, the Reorganized Debtor, or any other Protected Party relating to the treatment of Tort Claims and Unknown Tort Claims or (ii) otherwise modify the rights or obligations of the Estate, the Reorganized Debtor, or any other Protected Party as otherwise set forth in the Plan or a Plan Document.

## XIV.    TREATMENT OF EXECUTORY CONTRACTS.

In accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, all Executory Contracts of the Debtor will be assumed on the Effective Date, and assigned to the Reorganized Debtor (other than those Executory Contracts that have already been rejected by order of the Bankruptcy Court or are subject to a motion to reject Executory Contracts that is pending on the Confirmation Date).  Each Executory Contract assumed pursuant to this Section will vest or revest in, and be fully enforceable by, the Reorganized Debtor in accordance with its terms.

With respect to any indemnification obligations of the Debtor to any Person serving at any time on or prior to the Effective Date as one of its officers, employees, council members or volunteers, to the extent provided in any of the Debtor's constituent documents or by a written agreement with the Debtor or under the state laws pertaining to the Debtor, those obligations will be deemed and treated as Executory Contracts that are assumed by the Reorganized Debtor, pursuant to the Plan and Bankruptcy Code § 365 as of the Effective Date; *provided, however, that* under no circumstances will the Reorganized Debtor assume or be responsible for any alleged indemnification obligations of any non-Diocesan priests, clergy, or others against whom the Debtor has determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such Person(s) or such Person has or may have engaged in some other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Person.

Every Claim asserted by a creditor arising from the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day that is thirty (30) days after the Confirmation Date or the first Business Day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection if such Final Order is entered after the Confirmation Date.  Every such Claim which is timely filed, as and when it becomes an Allowed Claim, will be treated as a Class 7 General Unsecured Claim.  Every such Claim which is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged.

## XV.   **EFFECT OF CONFIRMATION.**

### A.   **Discharge.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date the Debtor and the Diocese will be discharged from, and their liability will be extinguished completely with respect to, any Claim or debt, whether reduced to judgment or not, liquidated or unliquidated, Contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, that arose from any agreement entered into or obligation incurred by the Debtor or the Diocese before the Confirmation Date, or from any conduct of the Debtor or the Diocese prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, and including all Claims and debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), and 502(i), whether or not a Proof of Claim was filed or deemed filed under Bankruptcy Code § 501, such Claim is Allowed under Bankruptcy Code § 502, or the holder of such Claim has accepted the Plan.

### B.   **Vesting.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Reorganized Debtor will be vested with all of the Assets of the Debtor, including all property of the Estate free and clear of all Claims, liens, encumbrances, charges and other Interests of creditors, and the Reorganized Debtor will, thereafter, hold, use, dispose or otherwise deal with such property, operate its business and conduct its ministry and mission free of any restrictions imposed by the Bankruptcy Code or by the Court. All Retained Claims are preserved under the Plan for the benefit of the Reorganized Debtor. Any Claims, causes of action, or demands transferred to the Trust are preserved for the benefit of the Trustee under the Trust.

### C.   **Exculpation and Limitation of Liability.**

Except as expressly provided in the Plan, none of the Exculpated Parties will have or incur any liability for any act or omission in connection with, relating to, or arising out of the Reorganization Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan or the Trust created hereunder, except for their willful misconduct or gross negligence and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or the Reorganization Case. Without limiting the generality of the foregoing, the Committee and the Debtor and their respective professionals are entitled to and granted the benefits of Bankruptcy Code § 1125(e).

QB\65418958.1

D.    **Limitation of Liability**.

The Protected Parties, the Trust, the Trustee, and professionals employed by the foregoing will not have any liability to any Entity, including any governmental entity or insurer, on account of payments made to a Tort Claimant or Unknown Tort Claimant, including any liability under the MSPA.

E.    **Channeled Claims**.

Channeled Claims are defined in the Plan as (i) Tort Claims, (ii) Unknown Tort Claims, and (iii) Claim against a Protected Party arising from, in connection with, or related in any way to such Claims.  The definition of Channeled Claims includes all such Claims whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity, or admiralty, including without limitation all Claims by way of direct action, subrogation, allocation of fault, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy.

In consideration of the undertakings of the Protected Parties under the Plan, which also benefit the Tort Claimants and Unknown Tort Claimants, and the protections afforded the Protected Parties under the Bankruptcy Code, including Bankruptcy Code § 105, the Plan causes any and all Channeled Claims to be channeled into the Trust and they must be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan, the Allocation Protocols, and the Trust Documents <u>as the sole and exclusive remedy for all holders of Channeled Claims</u>.

The channeling provisions are an integral part of the Plan and are essential to its implementation.

F.    **Permanent Injunction Against Channeled Claims**.

All Entities that have held or asserted, presently hold or assert, or may in the future hold or assert, any Channeled Claim are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purpose of asserting, enforcing, or attempting to assert or enforce any Channeled Claim, including:

1.    commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or against the property of any of the Protected Parties;

2.    enforcing, attaching, collecting, or recovering, by any manner or means from any of the Protected Parties, or from the property of any of the Protected Parties with respect to any such Channeled Claim, any judgment, award, decree, or order against any of the Protected Parties;

3.    seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Protected Parties or

-43-

the property of the Protected Parties, with respect to any discharged Claim or Channeled Claim;

4.      creating, perfecting, or enforcing any lien of any kind against any Protected Parties, or the property of any of the Protected Parties with respect to any such Channeled Claim;

5.      asserting, implementing, or effectuating any Channeled Claim of any kind against: (a) any obligation due any of the Protected Parties; (b) any Protected Party; or (c) the property of any Protected Party;

6.      taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan; and

7.      asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due from any of the Protected Parties or the property of any of the Protected Parties.

G.      **Channeling Injunction as Mutual Release.**

The provisions of **Section 26.5** of the Plan will further operate, as between all Protected Parties, as a mutual release of all Claims relating to the Debtor and all Claims against the Debtor that any Protected Party may have against another Protected Party, except as may specifically be reserved or set forth in the Plan.  The foregoing channeling provisions are an integral part of the Plan and are essential to its implementation.

H.      **Injunctions Deemed Issued and Permanent.**

On the Effective Date, the injunctions provided for in the Plan are deemed issued, entered, valid, and enforceable according to their terms and are deemed permanent and irrevocable.  All injunctions and/or stays provided for in the Plan, the injunctive provisions of Bankruptcy Code §§ 524 and 1141, and all injunctions or stays protecting any Protected Party are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.

I.      **Retention of Jurisdiction.**

After the Effective Date, the Bankruptcy Court will retain jurisdiction for the purposes expressly set forth in Article 28 of the Plan, which generally relate to enforcement and implementation of the Plan, including without limitation, allowance or disallowance of Claims, matters relating to Tort Claims and Unknown Tort Claims so long as such jurisdiction is consistent with the terms of the Trust, and other matters set forth in the Plan.

## XVI.  **FEDERAL TAX CONSEQUENCES.**

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS

-44-

WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR. THE FOLLOWING IS ONLY PROVIDED AS A GENERAL DISCUSSION OF POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT MEANT AS AN ANALYSIS OF HOW ANY PARTICULAR CREDITOR OR PARTY IN INTEREST MAY BE AFFECTED BY ANY TAX IMPLICATIONS OF THE PLAN.

Under the Tax Code, there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect creditors in the Reorganization Case.

### A.    **The Trust**.

On the Confirmation Date, the Trust will be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" ("**QSF**") pursuant to Section 468B of the Tax Code and the Treasury Regulations promulgated thereunder. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference. The Trust is intended to be classified as a QSF because:

1.    The Trust is established pursuant to an order of, or is approved by, the United States, any state, territory, possession or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2.    The Trust is established to resolve or satisfy one or more contested or uncontested Claims that has resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one Claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to Abuse (but excluding non-tort obligations of the Debtor to make payments to its general trade creditors or debt holders that relate to a case under Title 11 of the United States Code, a receivership, foreclosure or similar proceeding in a Federal or State court, or a workout); and

3.    The Trust is a trust under applicable state law.

4.    The primary tax consequences of the Trust being characterized as a QSF are the following:

(a)    The Trust must use a calendar taxable year and the accrual method of accounting.

-45-

**(b)** If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

**(c)** The Trust takes a fair market value basis in property contributed to it by the Debtor.

**(d)** The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%). The Debtor's funding of the Trust with Cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

**(e)** The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries.

**(f)** The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15, or later if an extension is granted under applicable law). The Trust will also be required to comply with a number of other administrative tax rules including filing informational returns (generally IRS Form 1099) when approved payments are made to claimants and, where applicable, certain withholding requirements.

**B.** **Federal Income Tax Consequences to Holders of Claims.**

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation. Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects it for federal, state and local tax purposes, based on its particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income. Distributions to Tort Claimants may or may not be taxable depending on whether the payment may be considered compensation for personal physical injuries.

The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, it is possible that the receipt of the distribution may not result in additional income to the claimant but may, as discussed below, result in a loss. Conversely, if the claimant had previously claimed a loss or bad debt deduction

-46-

with respect to the item previously included in income, the claimant may be required to include the amount of the distribution in income when received.

In general, a claimant receiving a distribution in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the Cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. It is possible that the income or loss may be a capital gain or loss if the Claim is a capital asset in the claimant's hands.

The Debtor and Committee intend that any payment on account of a Tort Claim or Unknown Tort Claim will constitute damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Tax Code.

## XVII.  MODIFICATION OF PLAN.

The Plan may be modified by the Plan Proponents, the Reorganized Debtor, and the Trustee (as applicable) from time to time in accordance with, and pursuant to, Bankruptcy Code §§ 1125 and 1127. The Plan may be modified by the Plan Proponents at any time before the Confirmation Date, *provided that* the Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123 and the Plan Proponents have complied with Bankruptcy Code § 1125. Each holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan as modified if the proposed alteration, amendment, or modification does not adversely change the treatment of such holder's Claim. Each holder of a Claim that votes in favor of the Plan authorizes the Plan Proponents to modify, at any time prior to the Effective Date and without the requirement of further solicitation, the treatment provided to the Class of Claims in which such Claims are classified, provided that the Bankruptcy Court determines that such modification is not material.

From and after the Effective Date, the Trustee and the Reorganized Debtor are authorized to enter into, execute, adopt, deliver, and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in the Plan and Plan Documents without further order of the Bankruptcy Court. Additionally, the Trustee and the Reorganized Debtor may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement previously approved by the Bankruptcy Court.

An order of the Bankruptcy Court approving any amendment or modification made pursuant to Article 27 of the Plan will constitute an order in aid of consummation of the Plan and will not require the re-solicitation of votes on the Plan to the extent not required under the Bankruptcy Code and other applicable law.

## XVIII.    ACCEPTANCE AND CONFIRMATION.

### A.    Voting Procedures.

#### 1.    Generally.

(a)    Only those Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan.  The Debtor reserves the right to supplement this Disclosure Statement (if necessary) and to solicit any of those Classes that may later prove to be impaired, if circumstances so warrant.

(b)    Ballots will be sent to the known holders of Claims that are entitled to vote.  For voting purposes only, Tort Claims will be estimated at $1.00.  Such estimation has no impact on any amount the holder of the Tort Claim may be entitled to receive, but merely equalizes each Tort Claim for purposes of voting on the Plan.

(c)    The holder of a Claim to which an objection has been filed, including any Tort Claims that are the subject of a pending objection as of the date of approval of this Disclosure Statement, is not entitled to vote on the Plan unless on or before [_____, 2020], the holder of such Claim requests that the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, temporarily allow the Claim in an appropriate amount solely for the purpose of enabling the holder of such Disputed Claim to vote on the Plan, and the Bankruptcy Court grants such request.

#### 2.    Form of Ballots.

(a)    Ballots for Class 10 Claims include certain releases and certifications that are required to be executed before a Class 10 claimant may receive funds from the Trust.  Any Class 10 Ballot received after the voting deadline, while it may not be counted as a vote for or against the Plan, will be effective as to the releases, certifications, and elections contained in such Ballot.

(b)    Ballots for Class 3 Claims (Faricy Claim) include an election to choose alternative treatment set forth in Section 8.2 of the Plan.

(c)    Ballots for Class 7 General Unsecured Claims include two separate elections to opt into the General Unsecured Convenience Claims Class and to waive the holder's Claim against the Debtor, which is, as noted, a non-profit organization.  A timely-submitted Ballot will be counted in accordance with the procedures and limitations herein, regardless of whether the holder of the Claim makes either election.  Any Class 7 Ballot received after the voting deadline but before commencement of payment on the Claim to which the Ballot pertains, while it may not be counted as a vote for or against the Plan, will be effective as to the elections contained in such Ballot.

3.       **Ballot Tabulation.**

(a)      Any Ballot that is properly completed, executed, and timely returned to counsel to the Debtor but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, will not be counted.

(b)      If no votes to accept or reject the Plan are received with respect to a particular Class that is entitled to vote, such Class will be deemed to have voted to accept the Plan.

(c)      If a creditor, or any Person acting on behalf of a creditor under applicable law, casts more than one Ballot voting the same Claim or Interest before the voting deadline, the latest dated Ballot received before the voting deadline will be deemed to reflect the voter's intent and thus to supersede any prior Ballots.

(d)      Creditors must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their votes within a particular Class.

(e)      The Person signing a creditor's Proof of Claim may complete and sign such creditor's Ballot, except that a creditor holding a Class 10 Claim is required to sign his or her own Ballot; *provided, however, that* a legal guardian or executor may sign on behalf of the claimant if proof of legal standing to do so is provided.

(f)      Any Class 10 Ballot that indicates either acceptance or rejection of the Plan will be counted as a vote to accept or reject the Plan regardless of whether the releases and certification portions of the Ballot are completed.

(g)      The following Ballots will not be counted or considered in determining whether the Plan has been accepted or rejected:

(i)      any Ballot received after the voting deadline, unless the Debtor granted in writing an extension of the voting deadline with respect to such Ballot prior to the voting deadline;

(ii)      any Ballot that is illegible or contains insufficient information to permit the identification of the creditor;

(iii)      any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

(iv)      any Ballot cast for a Claim scheduled at zero dollars ($0.00) or as unliquidated, Contingent, or disputed for which no Proof of Claim was timely filed;

(v)      any unsigned Ballot;

(vi)      any Ballot that does not indicate an acceptance or rejection, or indicates both an acceptance and rejection; and

-49-

(vii)   any Ballot transmitted to counsel to the Debtor by facsimile, e-mail, or other electronic means, unless previously authorized.

**(h)**   The Debtor will be permitted to contact creditors in an attempt to cure the deficiencies specified herein.

### 4.   Submission of Ballots.

**(a)**   A form of Ballot will be sent to all creditors entitled to vote on the Plan, along with a copy of this Disclosure Statement and a copy of the Plan.  Holders of Class 3 Faricy Claims, Class 10 Tort Claims, and Class 11 Unknown Tort Claims will receive forms of Ballots that are different from those sent to other creditors.

Creditors should read the Ballot carefully.  The Bankruptcy Court approved the form of Ballot prior to its mailing and the Ballot contains specific instructions as to the deadline for its submission and the place where it must be submitted.  If any creditor has any questions concerning voting procedures, it may contact:

> QUARLES & BRADY LLP
> Renaissance One
> Two North Central Avenue
> Phoenix, Arizona 85004
> Attention:  Michael Galen
> Telephone:  (602) 229-5255
> E-mail:  Michael.Galen@quarles.com

### B.   Feasibility.

The Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that liquidation of the Debtor, or the need for future reorganization, is not likely to follow after confirmation.  For the purpose of determining whether the Plan meets this requirement, the Reorganized Debtor's ability to meet its obligations under the Plan has been analyzed.  The Debtor has prepared projections of the cash flow for the ministries and operations of the Diocese and the Debtor.  The projections were prepared by the Debtor's management and are attached as Exhibit 2 to this Disclosure Statement.  The Debtor reasonably believes that it will be able to fund the Plan on the Effective Date and that the Reorganized Debtor will be able to make all payments required by the Plan.

### C.   Best Interests of Creditors and Liquidation Analysis.[11]

Under Bankruptcy Code § 1129(a)(7), the Plan must demonstrate that creditors will receive no less under the Plan than they would receive in a Chapter 7 liquidation of the Debtor.  Such

---

[11]   The following is provided for informational purposes only.  The Debtor asserts that it is not subject to conversion to a case under Chapter 7 of the Bankruptcy Code.  The only alternative to confirmation of a plan under Chapter 11 is dismissal.

liquidation analysis excludes property that is not property of the Debtor's Estate, including property the Debtor holds in trust or that is held in trust for it, such as restricted and custodial funds. The liquidation analysis also excludes other property that is property of the Estate, but which is not "capable of liquidation under Chapter 7" pursuant to the Religious Freedom Restoration Act and for other reasons.

Except with respect to Tort Claims and Unknown Tort Claims all creditors are being paid in full; therefore the best interest of creditors test (to the extent it applies) is met with respect to such creditors. Nevertheless, all creditors will do far better under the Plan than they would in a Chapter 7 liquidation because, among other things, in a Chapter 7 liquidation, participating party contributions would not be available.

Additionally, Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

> **1.** The Plan incorporates the Allocation Protocols. A Chapter 7 Trustee would likely be unable to implement the Allocation Protocols or a similar process in the absence of a confirmed Chapter 11 Plan. As such, substantial resources of the Estate would likely be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

> **2.** A Chapter 7 Trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtor, pursuant to 11 U.S.C. § 326. Any such payment would dilute the amount of funds available to pay creditors.

> **3.** Protected Parties would not obtain the benefits of the channeling injunction under the Plan, and, therefore, they would not make the substantial contributions they are making under the Plan.

> **D.** **Confirmation over Dissenting Class.**

> **1.** **Dissenting Class.** In the event that any impaired Class of Claims does not accept the Plan (or simply does not vote), the Bankruptcy Court may nevertheless confirm the Plan at the request of the Debtor if all other requirements under Bankruptcy Code § 1129(a) are satisfied, and if, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Classes. Each of these requirements is discussed below.

> **2.** **No Unfair Discrimination.**

> **(a)** The Plan "does not discriminate unfairly" if:

> **(i)** The legal rights of a dissenting Class are treated in a manner that is consistent with the treatment of other Classes whose legal rights are similar to those of the dissenting Class; and

> **(ii)** No Class receives payments in excess of those that it is legally entitled to receive for its Claims. Under the Plan:

(A)    all Classes of impaired Claims are treated in a manner that is consistent with the treatment of other similar Classes of Claims; and

(B)    no Class of Claims will receive payments or property with an aggregate value greater than the aggregate of the Allowed Claims in such Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims.

**3.    Fair and Equitable Test.**

(a)    The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims, and holders of equity Interests, as follows:

(i)    Secured Creditors.  Either:

(A)    each impaired Secured Creditor retains its liens securing a Secured Claim and receives on account of its Secured Claim deferred Cash payments having a present value equal to the amount of its Allowed Secured Claim;

(B)    each impaired Secured Creditor realizes the "indubitable equivalent" of its Allowed Secured Claim; or

(C)    the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with the first two clauses of this subparagraph.

(ii)    Unsecured Creditors.  Each impaired Unsecured Creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim. There is no absolute priority rule issue in the Reorganization Case because there are no equity Interests or junior creditors; or the holders of Claims and equity Interests that are junior to the Claims of the non-accepting Class do not receive any property under the Plan on account of such Claims and equity Interests.

(iii)    Equity Interests.  Either:

(A)    each holder will receive or retain under the Plan property of a value equal to or greater than (I) the fixed liquidation preference or redemption price, if any, of such Interest or (II) the value of such Interest; or

(B)    the holders of Interests that are junior to the non-accepting Class will not receive any property under the Plan.

(b)    As with the best interests of creditors test, the fair and equitable test is applied differently in the Reorganization Case than in most reorganization cases because the Debtor is not a moneyed corporation.  The members of a non-profit have no personal Interest in the property of the corporation.  Accordingly, there is effectively no equity Interest in the Debtor. Therefore, what is commonly referred to as the "absolute priority rule" embodied by Bankruptcy

Code § 1129(b)(2)(B) is not relevant in the Reorganization Case. The Debtor believes that the Plan satisfies the "fair and equitable" test with respect to all impaired Classes.

### E.  Risk Factors.

Perhaps the most significant risk factor to creditors' receipt of payment under the Plan is an appeal. The Effective Date of the Plan is triggered by and conditioned on, among other things, the final status of the Confirmation Order and certain other orders essential to Protected Parties. To the extent an appeal is pending and that condition to the Effective Date is not waived, creditors' receipt of payment and performance under the Plan may be delayed and ultimately confirmation may be overturned. For a discussion of what may happen should the Confirmation Order be overturned, please refer to Article XIX below.

Another risk to creditors' receipt of payment is non-confirmation of the Plan. Please refer to Article XIX below for a discussion of risks to creditors if the Plan is not confirmed.

### F.  Effect of Non-Confirmation.

In the event the Plan is not confirmed, it will not be binding on the Debtor, Committee, or any other Person. In such event, the Plan and Disclosure Statement will be treated as non-binding settlement communications subject to the protections of Federal Rule of Evidence 408 and may not be used as evidence.

## XIX.  ALTERNATIVES TO THE PLAN.

### A.  If The Plan Is Not Confirmed, Several Different Events Could Occur:

**1.**  The Debtor could propose another plan providing for different treatment of certain creditors; the Committee might propose a plan; or the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Reorganization Case if the Debtor is unable to confirm an alternative plan in a reasonable period of time.

**2.**  Under the third scenario, creditors of the Debtor would recover significantly less (and perhaps nothing) than they will under the Debtor's Plan. Without the protections, including the Channeling Injunction, available under a confirmed Plan, Protected Parties have little or no incentive to provide funding for the Debtor to pay creditors. Rather, the Catholic Charities litigation and Tort Claims litigation would likely continue, further depleting the resources that the Debtor would otherwise use to pay creditors under the Plan. This would leave very little, if any, to compensate survivors. In contrast, approximately $22.5 million will be available to creditors if the Plan is confirmed. Dismissal is therefore a poor alternative for creditors.

**3.**  If the Committee filed its own plan without the Debtor's support, the explanation above relating to dismissal would likely occur. Protected Parties would again have little or no incentive to provide the significant contributions they will provide under the Plan, and the creditors would be left to receive distributions from the Debtor's reduced Assets, rather than having access to $22.5 million.

Therefore, the Plan Proponents strongly recommend that creditors vote to accept the Plan, as set forth below.

## XX.    RECOMMENDATION OF THE PLAN PROPONENTS AND CONCLUSION.

**THE DEBTOR AND COMMITTEE RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.  THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RETURN TO CREDITORS UNDER THE CIRCUMSTANCES.**

QB\65418958.1

Dated and respectfully submitted this 23rd day of October , 2020.

**THE DIOCESE OF ST. CLOUD**, a Minnesota
religious corporation,

By

The Most Reverend Donald J. Kettler,
President

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

By _____

Donald Peschel, Committee Chairperson

Prepared and Submitted By:


/s/ Susan G. Boswell                          /s/ Robert T. Kugler
Susan G. Boswell (AZ Bar No. 004791)          Robert T. Kugler (Bar No. 194116)
Jason D. Curry (AZ Bar No. 026511)            Edwin H. Caldie (Bar No. 388930)
Michael Galen (AZ Bar No. 035044)             Phillip J. Ashfield (Bar No. 388990)
*Admitted Pro Hac Vice*                       STINSON LLP
150 South Fifth Street                        50 South Sixth Street
Suite 1800                                    Suite 2600
Minneapolis, Minnesota 55402                  Minneapolis, Minnesota 55402
susan.boswell@quarles.com
jason.curry@quarles.com
michael.galen@quarles.com                     *Counsel for the Official Committee of*
                                              *Unsecured Creditors*

*Counsel for the Debtor*

QB\65418958.1

# EXHIBIT 1

Diocese of St. Cloud
Balance Sheet as of 9/30/2020

|  | Unrestricted Balance | Restricted Balance |
|---|---|---|
| **Assets** | | |
| **Cash** | | |
| Cash - Checking | 564,644.88 | - |
| Cash - Annual Appeal Lockbox | - | 158,509.88  Note 1 |
| Total Cash | 564,644.88 | 158,509.88 |
| **Investments** | | |
| Diocesan Investments - Restricted | - | 608,938.46  Note 2 |
| Other Investments - Settlement Funds | 14,205,499.26  Note 3 | - |
| Total Investments | 14,205,499.26 | 608,938.46 |
| **Accounts Receivable** | | |
| Accounts Receivable | 333,517.01 | 24,263.00 |
| Spiritual Care Suspense | 1,380.00 | |
| Less: Allowance for Doubtful Accounts | (248,580.97) | (4,973.00) |
| Total Accounts Receivable | 86,316.04 | 19,290.00 |
| **Total Current Assets** | 14,856,460.18  Note 4 | 786,738.34 |
| **Property and Equipment** | | |
| Land and Land Improvements | 190,493.99 | - |
| Buildings and Improvements | 5,235,516.43  Cost | - |
| Equipment | 351,792.56  Cost | |
| Less: Accumulated Depreciation | (4,789,066.30) | - |
| Total Property and Equipment | 988,736.68 | - |
| **Total Assets** | 15,845,196.86 | 786,738.34 |

## Current Liabilities

**Accounts Payable** 915.94 -

**Accrued Expenses**
Accrued Vacation Expense 128,460.93 -
Total Accrued Expenses 128,460.93 -

## Notes Payable

Note payable to Diocese of St. Cloud Deposit and
Loan Fund, a Minnesota nonprofit corporation 82,078.95 -
Payroll Protection Program Note 512,500.00 -
Total Notes Payable 594,578.95 -

**Total Current Liabilities** 723,955.82  Note 5 -

**Net Assets** 15,121,241.04 786,738.34

**Total Liabilities and Net Assets** 15,845,196.86 786,738.34

**Note 1**
The funds held in this account are donor-restricted for specific purposes.  The debtor cannot use the funds for general operating expenses.

**Note 2**
Restricted/Custodial Charles Schwab Investments as of 9/30/2020 $608,938.46 Donor-retricted or held for others.  Pooled for investment purposes.

**Note 3**
These funds are held in FDIC insured CDs and a small amount of insured treasury notes.

**Note 4**
These assets do not include property the debtor holds for others.

**Note 5**
These liabilities do not include amounts asserted by Tort Claimants in connection with sexual abuse claims.  The alleged amount of these claims are unknown, but they are believed to far exceed the debtor's assets.

# EXHIBIT 2

# Diocese of St. Cloud - 5 year projection

| | Jan 2021 | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total Year 2021 | Total Year 2022 | Total Year 2023 | Total Year 2024 | Total Year 2025 | Total Year 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | | | | | | | | |
| Investment Income | 980 | 980 | 980 | 980 | 980 | 980 | 980 | 980 | 980 | 980 | 980 | 980 | 11,762 | 11,762 | 11,762 | 11,762 | 11,762 | 11,762 |
| Settlement Fund | 21,130,000 | | | | | | | | | | | | 21,130,000 | | | | | |
| D & L Line of Credit/Loan | 1,870,000 | | | 200,000 | | | | | | | | | 2,070,000 | | | | | 400,000 |
| Sale of Assets | | | | | | | | | | | | 517,000 | 517,000 | | | | | |
| Foundation Grants | 36,917 | 36,917 | 36,917 | 36,917 | 136,917 | 36,917 | 36,917 | 36,917 | 36,917 | 36,917 | 36,917 | 36,917 | 543,000 | 543,000 | 543,000 | 543,000 | 543,000 | 543,000 |
| Parish Assess. & Audits | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 250,597 | 3,007,160 | 3,007,160 | 3,007,160 | 3,037,232 | 3,067,604 | 3,098,280 |
| Annual Appeal | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 108,667 | 1,304,000 | 1,304,000 | 1,304,000 | 1,304,000 | 1,304,000 | 1,304,000 |
| Program Fees and Contract Income | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 39,571 | 474,855 | 474,855 | 474,855 | 474,855 | 474,855 | 474,855 |
| Advertising | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 |
| Catholic Mutual Refund | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 19,833 | 238,000 | 238,000 | 238,000 | 238,000 | 238,000 | 238,000 |
| Rental Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restricted Gifts | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Misc & Unrestricted Cont. | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 3,517 | 42,200 | 42,200 | 42,200 | 42,200 | 42,200 | 42,200 |
| **Total Revenues** | 23,465,498 | 465,498 | 465,498 | 665,498 | 565,498 | 465,498 | 465,498 | 465,498 | 465,498 | 465,498 | 465,498 | 982,498 | 29,402,977 | 5,685,977 | 5,685,977 | 5,716,049 | 5,746,421 | 6,177,097 |
| **Expenses:** | | | | | | | | | | | | | | | | | | |
| **Wages & Benefits** | | | | | | | | | | | | | | | | | | |
| Wages | 158,619 | 158,619 | 158,619 | 158,619 | 158,619 | 158,619 | 161,791 | 161,791 | 161,791 | 161,791 | 161,791 | 161,791 | 1,922,460 | 1,941,497 | 1,980,326 | 2,019,933 | 2,060,332 | 2,101,538 |
| Benefits & Taxes | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 65,392 | 784,702 | 784,700 | 793,560 | 802,420 | 811,280 | 820,140 |
| **Total Wages & Benefits** | 224,011 | 224,011 | 224,011 | 224,011 | 224,011 | 224,011 | 227,183 | 227,183 | 227,183 | 227,183 | 227,183 | 227,183 | 2,707,162 | 2,726,197 | 2,773,886 | 2,822,353 | 2,871,612 | 2,921,678 |
| **Assessments** | | | | | | | | | | | | | | | | | | |
| USCCB | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 3,911 | 46,932 | 46,932 | 48,340 | 49,790 | 51,284 | 52,822 |
| Minnesota Catholic Conf. | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 7,628 | 91,536 | 91,536 | 94,282 | 97,111 | 100,024 | 103,025 |
| Canon 1271 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 3,578 | 42,930 | 42,930 | 42,930 | 42,930 | 42,930 | 42,930 |
| St. Mary's Cathedral | 858 | 858 | 858 | 858 | 858 | 858 | 858 | 858 | 858 | 858 | 858 | 858 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 | 10,300 |
| **Total Assessments** | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 15,975 | 191,698 | 191,698 | 195,852 | 200,131 | 204,538 | 209,077 |
| **Professional Services** | | | | | | | | | | | | | | | | | | |
| Us Trustee Quarterly Fees - | - | - | | 225,000 | | | 17,100 | | | 13,300 | | | 255,400 | | | | | |
| Legal (Post effective Date) | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 165,000 | 100,000 | 80,000 | 50,000 | 50,000 | 50,000 |
| Computer Processing | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 4,125 | 49,500 | 49,995 | 50,495 | 51,000 | 51,510 | 52,025 |
| Parish Review | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 |
| CNS News Service & Editorial | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 35,000 | 35,350 | 35,704 | 36,061 | 36,421 | 36,785 |
| Misc | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 2,190 | 26,280 | 26,280 | 26,280 | 26,280 | 26,280 | 26,280 |
| **Total Professional Services** | 37,148 | 37,148 | 37,148 | 257,148 | 32,148 | 32,148 | 44,248 | 27,148 | 27,148 | 40,448 | 27,148 | 27,148 | 626,180 | 306,625 | 287,478 | 258,340 | 259,211 | 260,090 |
| **General/Operating Expenses:** | | | | | | | | | | | | | | | | | | |
| Telephone & Internet | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 | 19,851 | 19,851 | 20,050 | 20,250 | 20,453 | 20,657 |
| Postage | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 9,154 | 109,850 | 109,850 | 110,949 | 112,058 | 113,179 | 114,310 |
| Printing | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 18,817 | 225,800 | 225,800 | 228,058 | 230,339 | 232,642 | 234,968 |
| Advertising | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 | 3,600 | 3,636 | 3,672 | 3,709 | 3,746 |
| Travel | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 18,324 | 18,324 | 18,507 | 18,692 | 18,879 | 19,068 |
| Conferences/Training | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 |
| Formation | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 25,879 | 310,550 | 310,550 | 313,656 | 316,792 | 319,960 | 323,160 |
| Dues & Memberships | 648 | 648 | 648 | 648 | 648 | 648 | 648 | 648 | 648 | 648 | 648 | 648 | 7,775 | 7,775 | 7,853 | 7,931 | 8,011 | 8,091 |
| Subscriptions | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 3,500 | 3,500 | 3,535 | 3,570 | 3,606 | 3,642 |
| Computer Replacements | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 7,000 | 7,000 | 7,070 | 7,141 | 7,212 | 7,284 |
| Insurance | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 150,000 | 150,000 | 151,500 | 153,015 | 154,545 | 156,091 |
| Safe Environment | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 2,000 | 2,000 | 2,020 | 2,040 | 2,061 | 2,081 |
| Program Direct Expenses | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 414,000 | 414,000 | 418,140 | 422,321 | 426,545 | 430,810 |
| Employee Retention | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 2,017 | 24,200 | 24,200 | 24,442 | 24,686 | 24,933 | 25,183 |
| SCCH Utilities and Maint | | | | | | - | - | - | - | - | - | - | - | - | - | - | - | - |

# Diocese of St. Cloud - 5 year projection

| | Jan 2021 | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total Year 2021 | Total Year 2022 | Total Year 2023 | Total Year 2024 | Total Year 2025 | Total Year 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lay Pension Distribution | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 2,183 | 26,200 | 26,200 | 26,462 | 26,727 | 26,994 | 27,264 |
| Newman Center Program Expenses | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 95,000 | 95,000 | 95,950 | 96,910 | 97,879 | 98,857 |
| Other Program Funding | 3,167 | 3,167 | 3,167 | 3,167 | 103,167 | 3,167 | 3,167 | 3,167 | 3,167 | 3,167 | 3,167 | 3,167 | 138,000 | 138,000 | 139,380 | 140,774 | 142,182 | 143,603 |
| Misc Office | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 7,295 | 87,540 | 87,540 | 88,415 | 89,300 | 90,193 | 91,094 |
| Utilities Chancery and PC | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 19,200 | 19,200 | 19,392 | 19,586 | 19,782 | 19,980 |
| Contingency Health | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 | 5,000 | 5,050 | 5,101 | 5,152 | 5,203 |
| Repairs & Maintenance | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 16,596 | 16,596 | 16,762 | 16,930 | 17,099 | 17,270 |
| D & L Loan Payment | 3,116 | 6,233 | 6,233 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 523,900 | 594,683 | 163,164 | 163,164 | 163,164 | 163,164 | 163,164 |
| Equipment Rental | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 2,434 | 29,211 | 29,211 | 29,503 | 29,798 | 30,096 | 30,397 |
| Total General Expenses | 139,549 | 142,666 | 142,666 | 143,333 | 243,333 | 143,333 | 143,333 | 143,333 | 143,333 | 143,333 | 143,333 | 660,333 | 2,331,880 | 1,900,361 | 1,917,493 | 1,934,796 | 1,952,273 | 1,969,924 |
| | | | | | | | | | | | | | | | | | | |
| Diocesan Distributions: | | | | | | | | | | | | | | | | | | |
| Annual Appeal Distribution | - | - | - | - | - | 205,000 | - | - | - | - | - | - | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 |
| CEM Scholarships | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| | | | | | | | | | | | | | | | | | | |
| Total Expenses | 420,850 | 423,967 | 423,967 | 644,634 | 519,634 | 624,634 | 434,906 | 417,806 | 417,806 | 431,106 | 417,806 | 934,806 | 6,111,920 | 5,379,881 | 5,429,710 | 5,470,620 | 5,542,633 | 5,615,769 |

**Plan Payments**

**Class**

| | Jan 2021 | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total Year 2021 | Total Year 2022 | Total Year 2023 | Total Year 2024 | Total Year 2025 | Total Year 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Claims - Great American | 3,221 | | | | | | | | | | | | 3,221 | | | | | |
| Professional Charges | 500,000 | | | | | | | | | | | | 500,000 | | | | | |
| Priority Unsecured Claims | | | | | | | | | | | | | - | | | | | |
| Priority Tax Claims | | | | | 3,302 | | | | | | | | 3,302 | | | | | |
| 1 Priority Employee Unsecured Claims | | | | | | | | | | | | | - | | | | | |
| 2 Petition Date Secured Tax Claims | | | | | | | | | | | | | - | | | | | |
| 3 Faricy Claim | - | - | | | | | | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 20,000 | 48,000 | 48,000 | 48,000 | 48,000 | 373,623 |
| 4 USBank PPP Loan Claim | | | | | | | | | | | | | - | | | | | |
| 5 Catholic Charities Claims | | | | | | | | | | | | | - | | | | | |
| General Unsecured Convenience Claims | | | | | | | | | | | | | | | | | | |
| 6 < $2000 Paid Feb 2021 | 899 | | | | | | | | | | | | 899 | | | | | |
| 7 General Unsecured Claims >$2000 | | | | | | | | 15,000 | | | | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 13,000 |
| 8 Other Tort and Employee Claims | | | | | | | | | | | | | - | | | | | |
| 9 Annuity Claims | | | | | | | | | | | | | - | | | | | |
| 10 Tort Claims | 22,500,000 | | | | | | | | | | | | 22,500,000 | | | | | |
| 11 Unknown Tort Claims | | | | | | | | | | | - | | - | 150,000 | 100,000 | 100,000 | 75,000 | 75,000 |
| 12 Co-Defendant and Parish Claims | | | | | | | | | | | | | - | | | | | |
| 13 Insurance Benefit Claims | | | | | | | | | | | | | - | | | | | |
| 14 Penalty Claims | | | | | | | | | | | | | - | | | | | |
| | - | | | | - | | - | | | | - | | - | - | - | - | - | - |
| Total Plan Payments | 23,004,120 | - | - | - | 3,302 | - | - | 19,000 | 4,000 | 4,000 | 4,000 | 4,000 | 23,042,422 | 213,000 | 163,000 | 163,000 | 138,000 | 461,623 |
| | | | | | | | | | | | | | | | | | | |
| Operating Surplus (Deficit) | 40,529 | 41,531 | 41,531 | 20,865 | 42,563 | (159,136) | 30,592 | 28,692 | 43,692 | 30,392 | 43,692 | 43,692 | 248,635 | 93,096 | 93,267 | 82,428 | 65,788 | 99,705 |

**Notes:**

**Deposit and Loan Line of Credit**

Deposit and Loan Line of Credit/Loan for 2021 the agreement is to pay interest only (at 4%) will pay down with sales of assets

For the years of 2022 through 2026 the loan amortization is $1,553,000 P & I over 12 years

**Sale of Assets**

3 homes on Chancery property are for sale, expect to net $517,000  This plan assumes we will have it liquidated by the last Qtr of 2021.  The proceeds will be applied to the Line of Credit.